FASA CORPORATION and Virtual World Entertainment, Plaintiffs,

v.

PLAYMATES TOYS, INC., Defendant.

No. 93 C 2445.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 22, 1996.

Karen B. Ksander and Catherine Van Horn, Sonnenschein Nath & Rosenthal, Chicago, IL, for plaintiffs.

Mark V.B. Partridge, Brett A. August and Maxine Lans Retsky, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, IL, Jack D. Samuels and Donald L. Samuels, Samuels & Samuels, Los Angeles, CA, for defendant.

### TABLE OF CONTENTS

I. FINDINGS OF FACT — Phase Two Of Trial .............................. 1131
 A. Development of BATTLETECH Universe ............................. 1131
 B. Development of Virtual Reality ........................................ 1134
 C. Sales Of The BATTLETECH Property ................................ 1140
 D. Recognition of BATTLETECH Among the Relevant Consumers .......... 1141
 E. Originality and Distinctiveness of the BATTLETECH Property ........... 1141
 F. Copyright Registrations ............................................ 1142
II. CONCLUSIONS OF LAW — Phase Two ................................... 1145
 A. FASA Has Established Original Expressions Of Ideas That Are Protected By The Copyright Act ............................................. 1145
 B. FASA Has Established That It Has Protectible Trade Dress Rights ........ 1148
III. FINDINGS OF FACT — Phase Three of Trial ............................. 1151
 A. The Development Of The EXO–SQUAD Toy Line By Playmates .......... 1151
 B. FASA's Efforts To License Its BATTLETECH Designs To Tyco .......... 1155
 C. FASA's Alleged Confusion Evidence ................................. 1155

D. Playmates' Survey Evidence Established A Lack of Any Trade Dress Confusion.............................................................. 1156
E. Playmates' Heavy Attack E–Frame Prototype Is Not Substantially Similar To FASA's Mad Cat Design.......................................... 1157
F. Playmates' Marsala Light Attack E–Frame Toy Is Not Substantially Similar to FASA's Black Hawk Design ........................................ 1158
G. Playmates' Livanus Light Attack E–Frame Is Not Substantially Similar To FASA's Black Hawk Design........................................ 1158
H. Playmates' Livanus Light Attack E–Frame Is Not Substantially Similar To FASA's Bushwacker Design ........................................... 1159
I. Playmates' General Shiva Light Attack E–Frame Is Not Substantially Similar To The King Crab Design...................................... 1159
J. Playmates' Alec DeLeon E–Frame Is Not Substantially Similar To FASA's Koshi Design........................................................ 1160
K. Playmates' Alec DeLeon E–Frame Is Not Substantially Similar To FASA's Daishi Design ...................................................... 1161
L. Playmates' Maggie Weston Repair Light Attack E–Frame Is Not Substantially Similar To FASA's Dasher Design ................................... 1161
M. The Heavy Attack E–Frame Prototypes Of EXO–SQUAD Toys Were Independently Created ..................................................... 1162
N. The Development Of EXO–SQUAD Toys Draws Inspiration From Third–Party Designs And Designs And Properties Other Than BATTLETECH 1163
O. Specific, Non–Trivial Design Features Distinguish EXO–SQUAD From BATTLETECH ...................................................... 1166
IV. CONCLUSIONS OF LAW — Phase Three ............................... 1167
A. FASA Failed To Establish By A Preponderance Of The Evidence That Its Protectible Copyright Interests Were Copied By Playmates ............... 1167
B. FASA Failed To Establish By A Preponderance Of The Evidence That There Is A Likelihood Of Confusion About The Source of EXO–SQUAD Toys ................................................................. 1171
C. Playmates' Inclusion Of A Picture Of Its Planned Heavy Attack E–Frame In Its 1993 Toy Catalog Did Not Constitute Unfair Competition .............. 1173
V. CONCLUSION ....................................................... 1174

---

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Toys and games are usually welcome diversions to the serious problems that too often confront our daily lives. This case, however, involves a serious business dispute about games and toys. Plaintiffs FASA Corporation and Virtual World Entertainment (collectively "FASA") claim that defendant Playmates Toys, Inc. ("Playmates") violated FASA's copyright and trademark rights to a series of robot-like battlefield characters, which are used in a futuristic setting known as BATTLETECH, when Playmates introduced a series of futuristic robot-like toys known as EXO–SQUAD.

In a previous opinion, this Court addressed Playmates' motion for summary judgment and outlined many of the legal standards that the Court has applied in this bench trial. *See FASA Corp. v. Playmates Toys, Inc.,* 869 F.Supp. 1334 (N.D.Ill.1994) (*"FASA I"*). *FASA I* granted Playmates' motion for summary judgment as to Count II (common law unfair competition), Counts VII and VIII (anti-dilution) and Count IX (tortious interference) and denied the motion as to Count I (Lanham Act unfair competition), Counts III and IV (copyright infringement) and Counts V and VI (trademark infringement). These latter counts proceeded to trial and are addressed in this opinion. Prior to the commencement of trial, this Court, after receiving input from the parties, imposed time limitations for the trial of this case and divided the trial into four phases: Phase I dealt with a waiver issue; Phase II focused on the validity and identification of FASA's alleged copyright and trade dress rights; Phase III focused on all infringement and liability issues; and Phase IV was to focus on damages. *See FASA Corp. v. Playmates Toys, Inc.,* 892 F.Supp. 1061, 1070 (N.D.Ill.1995).

("*FASA II*"). *FASA II*, which was issued at the conclusion of Phase I, rejected Playmates' affirmative defense of waiver, which could have been dispositive of all of FASA's claims.

This opinion, which deals with Phases II and III of the trial, is the third opinion issued by the Court in this case ("*FASA III*"). In this opinion, the Court finds that FASA has established certain protectible copyright and trademark rights but has failed to prove any facts which establish liability on the part of Playmates. Therefore, Phase IV of the trial will not be necessary and judgment is hereby entered in favor of Playmates.

Pursuant to Fed.R.Civ.P. 52, the Court hereby enters the following Findings of Fact and Conclusions of Law regarding Phases II and III of the trial. The Findings of Fact are based upon consideration of the parties' uncontested facts, all the admissible evidence, as well as this Court's assessment of the credibility of the trial witnesses. To the extent, if any, that the Findings of Fact as stated may be deemed Conclusions of Law, they should be considered Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be deemed Findings of Fact, they should be considered Findings of Fact.

## I. FINDINGS OF FACT—Phase Two Of Trial

### A. *Development of BATTLETECH Universe*

1. FASA originally introduced BATTLETECH as a boxed board game entitled BATTLEDROIDS in 1984. The general idea of BATTLETECH involves a complex, war-strategy game involving a futuristic civil war where combatants are both humans and genetically bred humans and use large and medium scale robot-like tanks, as well as powered battlesuits, as their weapons.

2. The game was developed by FASA's founders, Jordan Weisman and Ross Babcock, after they attended the 1984 Annual Trade Show of the Hobby Industries of America which was held in Anaheim, California between January 31, 1984 and February 5, 1984. (Weisman Tr. 261–275; Babcock Dep.).[1]

3. While attending the trade show, Weisman and Babcock saw several Japanese robot model kits that were displayed for sale by Twentieth Century Imports ("TCI"). Weisman and Babcock discussed with TCI representatives the possibility of creating a board game using the model kits as game markers. (Weisman Tr. 268–70; Babcock Dep.). FASA obtained licenses from TCI to use several of the MECH designs.

4. Thereafter, FASA began to develop a fictional universe for the BATTLEDROIDS game. The game was set in the 31st century where the Star League, a once-flourishing empire consisting of five separate cosmic houses, has been devastated by over two hundred years of bitter civil war. Each house, encompassing hundreds of different interstellar worlds, seeks to control the galaxy, known as the Inner Sphere. The battlefields on these worlds are dominated by BATTLEMECHs (also called "MECHs"), massive robot-like tanks of various shapes and designs. (Weisman Tr. 278–91, 358, 396–98; Babcock Dep.).

5. FASA also developed rules for playing the game. BATTLEDROIDS was a new type of science-fiction game system that combined a traditional board game with a more contemporary role-playing game. Each player would control one or more MECH playing pieces on a terrain-specific game board consisting of six-sided grids. The player or gamemaster directed the movement, weaponry and targets of each MECH playing piece and recorded damage sustained to each MECH during battle in accordance with an elaborate set of rules. (PX 1; Weisman Tr. 272–76).

6. In August of 1984, FASA created several copies of its prototype BATTLEDROIDS game and made initial sales to

---

1. All transcript references are to the trial transcripts in this case and generally will specifically indicate the witness where appropriate. The parties' Joint Exhibits are identified as "JX____." Plaintiffs' Exhibits are identified as "PX____" and Plaintiffs' Group Exhibits are identified as "PGX____." Defendant's Exhibits are identified as "DX____." References to depositions, received in evidence and relied upon by the Court, are identified as "Dep."

**1132**

some FASA distributors. (PX 149; Weisman Tr. 268–74).

7. By September of 1984, FASA had decided to proceed with full scale production of the BATTLEDROIDS game and placed a large order for model kits from TCI for game markers. FASA also requested that TCI obtain artwork of the models from the Japanese manufacturer for use in the BATTLEDROIDS game and supplemental products. (PX 138; DX 2; Weisman Tr. 288, 360–61; Lewis Tr. 743–45).

8. In late November of 1984, the model kits arrived and were inserted into the BATTLEDROIDS game boxes. Thereafter, FASA began selling the BATTLEDROIDS game through its nationwide distribution network, which consisted of hobby shops, game shops, comic book shops and book stores. (PX 1, 144–45; Weisman Tr. 272–81).

9. The name of the BATTLEDROIDS game was changed in 1985 pursuant to a settlement between FASA and LucasFilm, which had obtained a registration for the mark DROIDS. FASA was then negotiating with LucasFilm for a license for *Star Wars* products and determined that it was in FASA's best interest to work out an agreement with LucasFilm to sell off the remaining BATTLEDROID games and change the name. (PX 150; Weisman Tr. 273–74).

10. When a second edition of the game was printed in the fall of 1985, BATTLEDROIDS became BATTLETECH. The rules of the game and the fictional setting of the game did not change, although the model kit markers were replaced by paper game markers bearing the same designs because the model kit markers were too large to function properly as game pieces. (PGX 2A; Weisman Tr. 275–80).

11. FASA designed the BATTLETECH universe as a dynamic and constantly evolving fictional environment and carefully planned a controlled schedule of complementary products to promote sales. (Weisman Tr. 275–89). The BATTLETECH game allowed a player to experience a unique interaction between the MECHs and their individual designs. (Weisman Tr. 378).

12. During the fall of 1985, FASA created and introduced its first two BATTLETECH game supplements: *The Black Widow* (a scenario pack) and *The Fox's Teeth* (a scenario pack). Scenario packs are books that describe several different battles. The player is told how the battle started, what forces were used and how to orient his game maps and playing pieces to recreate the scene. The object is to see if the player can change the outcome of the original battle. Scenario packs are designed to appeal to the general reader of science fiction as well as the game player. These two products featured fictional text created by FASA along with FASA's renditions of the MECH designs licensed from TCI. (PX 89; PX 94; PGX 2B; PGX 2C; Weisman Tr. 286–87).

13. In late 1985 and early 1986, FASA decided to continue the expansion of the BATTLETECH universe by creating its own original BATTLEMECH designs with a look that was intended to distinguish BATTLETECH from the Japanese models that were used in the original game. (Weisman Tr. 285).

14. The appearance of the Japanese designs to which FASA had access, were typical of the Japanese giant robot genre at the time and may be described as humanoid, reflecting human forms clothed in metal body armor in superhero-like poses. The weapons and other accessories appear to be attached to the surface of the units, rather than built into the units as integral parts. (Loose Tr. 435–36).

15. FASA hired Duane Loose, an independent artist under contract to FASA, to design MECHs for a source book called *Technical Readout 3025*, a product that FASA planned to release in 1986. (PX 36). A source book provides background information about the universe so that players can become more deeply involved in the fictional premise of the game. *Technical Readout 3025* was designed to become a catalogue containing illustrations, statistics and history for the new MECH designs FASA was creating for use in the BATTLETECH game. The name of the book identifies it as a resource for robotic vehicles in the BATTLETECH universe in the year 3025. (PX 3C;

118–19; Weisman Tr. 284–88; Loose Tr. 418–28).

16. Duane Loose created *original* MECH designs for *Technical Readout 3025* based upon MECH names and statistics furnished to him by FASA. The MECHs designed by Loose include: Assassin, Atlas, Awesome, Banshee, Blackjack, Catapult, Centurion, Charger, Clint, Commando, Cyclops, Dervish, Dragon, Enforcer, Firestarter, Grasshopper, Hatchetman, Hermes II, Jagermech, Javelin, Jenner, Orion, Panther, Quickdraw, Trebuchet, UrbanMech, Valkyrie, Victor, Vindicator, Vulcan, Whitworth and Zeus. (PX 96, 117; PGX 3C; Weisman Tr. 287–90; Loose Tr. 427–519).

17. Loose assigned to FASA all of his right, title and interest in the designs he created for FASA. (PX 118; Loose Tr. 459–60).

18. The MECH designs created by Loose differed significantly from the Japanese designs by being primarily based on technology and machines rather than humanoid designs. The designs were intended to carry out FASA's vision of MECHs as vertical tanks that appeared realistic enough to survive the futuristic battlefield. (Loose Tr. 435–40).

19. The armor of Loose's MECH designs does not appear in uninterrupted expanses, but is made from small segments or panels of plating bolted together. The weapons and other accessories of these designs typically appear as integral to the MECH, rather than as an appendage, so they would not seem likely to be broken off in battle. Loose's designs include occasional diagonal venting or stripes, a checkerboard effect on missile openings, and conical ends to angular weapons. (Loose Tr. 437–55).

20. Loose's designs featured a prominent cockpit "with personality" based on visual language that would allow the public to identify the specific MECH by face. (Loose Tr. 442–43, 450). Loose specifically designed MECHs for FASA based on a two to three page written description provided by the writers of the FASA fiction. The descrip-tions that Loose used as a map in creating the designs generally covered the speed, armor, armament, history, name, and manufacturer of the MECH. Loose was given pictures and models of all the licensed designs to use as the basis for his drawings. (Loose Tr. 434:9–21, 528:2–23).

21. The original Japanese designs licensed by FASA are still sold in the BATTLETECH universe along with other FASA designs. (Weisman Tr. 365:16, 375:25, 377:9–17, 388:3–389:24, 407:22–408:9, 414:17–425:15). The Japanese designs look different from Loose's designs. Loose changed some of these humanoid-type designs by adding more realistic machine features. (Loose Tr. 438:12–439:14, 489:15–23). Mr. Loose repeatedly reworked the licensed designs. (Loose Tr. 451:19–453:6, 460:17–461:8, 462:13–21, 469:14–20, 495:5–16, 496:8–19, 497:14–21, 498:17, 501:6–11, 503:20–504:3, 507:2–19, 508:14–509:2, 512:22–513:3, 517:1–6, 520:21–521:5, 552:16–23).

22. FASA continues to publish Mr. Loose's drawings of the licensed designs as an integral part of the BATTLETECH universe: they appear in most FASA publications. (Loose Tr. 520:2–17).

23. Those BATTLETECH designs created by FASA's successor designer, Mr. Knutson, also tried to get away from a human form look. (Knutson Declaration ("Decl.")[2]; Tr. 635:1–637:8). Mr. Knutson wanted to put his own "stamp" on the BATTLETECH designs he created. (Knutson Decl.; Knutson Tr. 641–42).

24. During 1986, FASA created and introduced nine new BATTLETECH products. (PGX 3, 94). In April of 1986, BATTLETECH Map Set #1 was released. (PGX 3A). The first BATTLETECH novel, *Decision At Thunder Rift* was introduced in July of 1986. (PGX 3B). In August of 1986, FASA released *BATTLETECH Technical Readout 3025* (PGX 3C), followed by BATTLETECH Blueprints (PGX 3H) and two new boxed games, AEROTECH (PGX 3G) and CITYTECH (PGX 3F). FASA also introduced *MECHWARRIOR, The Role–Playing*

---

**2.** During the trial, the Court received direct testimony by sworn declarations. This testimony was then subject to live cross-examination during the trial. *See e.g., Saverson v. Levitt,* 162 F.R.D. 407 (D.D.C.1995) (approving of submission of direct testimony by deposition or affidavit).

*Game* (PGX 3D) in August of 1986, a graphic novel called *The Spider and The Wolf* (PGX 3I) in September of 1986 and another scenario pack called *Cranston Snord's Irregulars* (PGX 3K) in November of 1986. Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH products, including, on occasion, FASA's interpretation of several of the designs licensed from TCI. Each product contained a proper copyright notice. (Weisman Tr. 276–320).

25. The BATTLETECH *Technical Readout 3025* received the 1986 H.G. Wells Award for Best Role–Playing Game Supplement. The H.G. Wells Awards are nominated by members of the Academy of Adventure Gaming Arts and Design and voted on by the general gaming public. They are presented each year at the ORIGINS game convention. (PX 417; Weisman Tr. 286, 292–93; Schick Decl.).

26. By the end of 1986, BATTLETECH had established itself as one of the best selling science fiction games on the market with retail sales exceeding $1 million. (PX 73A, 80–84; Weisman Tr. 289–96; Stevers Decl.).

27. FASA expanded the BATTLETECH universe in 1987 with the creation and release of 14 new products (PGX 4; PX 94), including:

*Grey Death Legion,* a scenario book, in Jan., 1987 (PGX 4A)

*The Sword and The Dagger,* a novel, in Feb., 1987 (PGX 4B)

*Mercenary's Handbook,* a sourcebook, in Feb., 1987 (PGX 4C)

BATTLEFORCE, a boxed game, in April, 1987 (PGX 4D)

BATTLETECH Reinforcements, a game accessory, in June, 1987 (PGX 4E)

BATTLETECH Map Set # 2, a game accessory, in June, 1987 (PGX 4F)

*House Steiner,* a source book, in July, 1987 (PGX 4G)

*Mercenary's Star,* a novel, in Aug., 1987 (PGX 4H)

*The Succession Wars,* a boxed game, in Aug. 1987 (PGX 4I)

*Technical Readout 3026,* a source book, in Aug. 1987 (PGX 4K)

*BATTLETECH Manual,* a rulebook, in Aug. 1987 (PGX 4J)

*Sorenson's Sabres,* a scenario pack, in Nov. 1987 (PGX 4M)

*Kurita: The Draconis Combine,* a source book, in Nov. 1987 (PGX 4N)

*The Galter Campaign,* a scenario book, in Nov. 1987 (PGX 4L).

Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH products, including FASA's interpretations of several of the designs licensed from TCI. Each product contained a proper copyright notice. (Weisman Tr. 295–310; Lewis Decl.).

28. BATTLETECH won the 1987 Gamer's Choice Award for the Best Science Fiction/Strategy Game at the 1987 GenCon Convention, the oldest and largest game convention in the world. (Lewis Decl.).

### B. *Development of Virtual Reality*

29. In 1987, the founders of FASA spun off a sister company called Environmental Simulation Project, Inc. ("ESP") (subsequently known as Virtual World Entertainment), which was dedicated to the design, creation, development and construction of the world's first multi-player, real time simulator allowing consumers to explore and interact with the BATTLETECH universe in a computer generated "Virtual Reality." (PX 409–13; Weisman Tr. 299–305).

30. On June 17, 1987, FASA entered into an Agreement with Incredible Technologies, a computer development firm for the creation of hardware and software for ESP's BATTLETECH project. Under the terms of that Agreement, all tangible and intangible products of Incredible Technologies' development work, including graphic materials, automatically became the sole property of FASA (along with any patent or copyright rights) upon FASA's corresponding payment for such work. (PX 37, 47; Weisman Tr. 302–03).

31. As ESP began to develop the BATTLETECH Virtual Reality game, FASA continued to expand the BATTLETECH universe by creating new MECH designs and new BATTLETECH products. In 1988,

FASA created two new MECHs for a source-book entitled *House Liao*. The Raven and the Cataphract were the original creations of FASA employee Todd Marsh. (PX 96; PGX 58; Lewis Decl.).

32. In 1988, FASA created and introduced twelve new BATTLETECH products (PX 94, PGX 5):

*The Price of Glory*, a novel, in Jan. 1988 (PGX 5A)

*House Liao*, a source book, in Feb. 1988 (PGX 5B)

*Dropships and Jumpships*, a source book, in Feb. 1988 (PGX 5C)

*House Davion*, a source book, in June 1988 (PGX 5D)

*Warrior En Guard*, a novel, in July, 1988 (PGX 5E)

*Rolling Thunder*, a scenario book, in July, 1988 (PGX 5F)

*Warrior Riposte*, a novel, in July, 1988 (PGX 5G)

*Shrapnel*, a short story collection, in Aug. 1988

*The Periphery*, a source book, in Sept., 1988 (PGX 5H)

*The Kell Hounds*, a scenario book, in Dec., 1988 (PGX 5I)

PlasTech Mechs, a game accessory, in Dec. 1988 (PGX 5J)

Cammo Specs, a game accessory, in Dec. 1988 (PGX 5K).

Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH products, including, on occasion, FASA's interpretations of several of the designs licensed from TCI. Each product contained a proper copyright notice and complied with all statutory copyright formalities. (Weisman Tr. 319–25; Lewis Decl.).

33. In 1989, FASA added 25 new MECHs to its growing collection of original MECH designs. Created by Dana Knutson, a FASA employee, the following MECHs were first featured in *Wolf's Dragoons*, a source book released in April of 1989 (PGX 6E): Falcon, Firefly, Flea, Hoplite, Hornet, Imp, Shogun and Wolfhound. Of these, the Flea and the Falcon were based on an original sketch created by Ral Partha, FASA's BATTLE-TECH miniatures licensee, which assigned all right, title and interest in the design to FASA. (PX 96; Knutson Decl.; Lewis Decl.).

34. FASA employee Knutson also designed new MECHs for the source book entitled *Technical Readout 2750* (PGX 6I). These MECHs included: Black Knight, Champion, Crab, Crockett, Exterminator, Flashman, Hermes, Highlander, Hussar, King Crab, (depicted in Appendix A), Kintaro, Lancelot, Mongoose, Sentinel, Thorn, Thug and Wyvern. (PX 96; Lewis Decl.; Knutson Decl.). Of these, the Black Knight, Crab, Highlander, King Crab, Lancelot, Mongoose, Thug and Wyvern were based on original sketches created by Ral Partha, FASA's BATTLETECH miniatures licensee, which assigned all right, title and interest in the designs to FASA. (PX 96; Knutson Decl.; Lewis Decl.).

35. Many of the original designs created by Knutson are distinguished by the de-emphasis of the head, in contrast to the Japanese designs which frequently featured a head with antennae. Unless otherwise required by the writer, the Knutson designs incorporate a head lowered into the body or appear headless, with a torso that resembles a spaceship or a tank on legs. Knutson also attempted to carry on the technical realism of the look created by Duane Loose for FASA. (Knutson Decl.; Tr. 641–42).

36. Knutson created MECHs for FASA based upon the written description provided by the writers of the BATTLETECH fiction, which included specifics about the size, fire power, and other attributes of the MECH. (Knutson Decl.).

37. In 1989, FASA created and released 10 new BATTLETECH products (PX 94; PGX 6):

*Wolves on the Border*, a novel, in Jan., 1989 (PGX 6B)

*The Star League*, a source book, in Jan., 1989 (PGX 6A)

*Warrior Coupe*, a novel, in Jan., 1989 (PGX 6C)

*The War Book—Part I*, a source book, in Feb., 1989 (PGX 6D)

*Wolf's Dragoons*, a source book, in April, 1989 (PGX 6E)

*Heir to the Dragon,* a novel, in June, 1989 (PGX 6G)

*BattleTech 20 Year Update,* a source book, in June, 1989 (PGX 6F)

BATTLETROOPS, a boxed game, in Aug., 1989 (PGX 6H)

*Technical Readout 2750,* a source book, in Aug., 1989 (PGX 6I)

*War Book II,* a source book, in Sept., 1989 (PGX 6K).

Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH products, including, on occasion, FASA's interpretations of several of the designs licensed from TCI. Each product contained a proper copyright notice. (Lewis Decl.).

38. In 1989, FASA also laid the groundwork in the fiction of the BATTLETECH universe for the introduction of new MECHs created for the Virtual Reality game. The fictional premise involved the coming of the Clans, groups of strange, aggressive military forces from beyond the Periphery or outer edges of the known space. The Clans used an advanced eugenics program to breed a specialized group of elite warriors to pilot OMNIMECHs (Clan MECHs) and Aerospace fighters. The Clans also introduced a new type of combatant into the BATTLE-TECH universe known as an Elemental. These genetically bred human beings stood over eight feet tall and possessed superior strength and speed. Equipped with individual battle armor suits, known as Elemental suits, a small group of Elementals was capable of bringing down a single MECH. The Clans (and the Elementals) added a completely new dimension to the BATTLE-TECH universe by permitting new conflict and combat.

39. Although FASA had planned to incorporate all of FASA's original MECH designs into the BATTLETECH Virtual Reality game, programmers encountered difficulty in reproducing the large number and variety of MECHs existing in the BATTLETECH universe. As a result, Incredible Technologies and FASA created the OMNIMECHs.

40. The first of the OMNIMECHs was an original design known as the Mad Cat, which is depicted in Appendix B. The Mad Cat was designed to be lighter, faster, stronger and more flexible than other BATTLETECH MECHS. (Weisman Tr. 311–13). BATTLETECH fans received their first glimpse of the Mad Cat in a newsletter in the summer of 1988. (PX 155).

41. The Mad Cat and other Clan OMNIMECHs were created by Tim Skelly, a software programmer employed by Incredible Technologies, under the direction of FASA founders Jordan Weisman and Ross Babcock. (Weisman Tr. 310–18; Babcock Dep.). Once developed on the computer, the Mad Cat image was translated by an artist, Steve Venters, an independent contractor of FASA, into a full scale design and incorporated, along with the three other OmniMech designs (Thor, Vulture, and Loki) developed for the Virtual Reality game, into the BATTLE-TECH game systems, supplements, novels and other products. (PX 806–09; Weisman Tr. 317–19; Venters Decl.; Lewis Decl.).

42. Steve Venters' remaining OmniMech designs (Black Hawk, (depicted in Appendix C); Daishi, (depicted in Appendix D); Dasher (depicted in Appendix E); Dragonfly; Fenris; Gladiator; Koshi, (depicted in Appendix F); Man O'War; Masakari; Puma; Ryoken and Uller), were also original creations. Venters' goal in creating his designs was to make the MECHs symmetrical and based on basic shapes and combinations of basic shapes. His designs were intended to look as if the MECHs were actually built by machines. Further, his designs were realistic in the sense that they were not true science "fiction" but "science projection"—something that may actually develop in the future. (Venters Decl.).

43. Steven Venters assigned to FASA all his right, title and interest in the designs he created for FASA. (Venters Decl.).

44. The Mad Cat made its virtual reality debut in August of 1990 with the opening of The BATTLETECH Center Virtual Reality Entertainment Center at North Pier in Chicago, Illinois. (Weisman Tr. 330–36).

45. The BATTLETECH Center was the first generation of a new genesis of electronic entertainment, which has come to be known as "Virtual Reality." After a briefing

in the ready area of the Center, the consumer is seated in a jet fighter style cockpit designed to represent the control center of his own BATTLEMECH. · The cockpit contains a variety of monitors, switches, buttons and lighted displays. The consumer "moves" the MECH in the computer generated environment through the use of a throttle and joystick. As the MECH moves, a large television monitor in the cockpit shows the changing terrain outside. The consumer can explore one hundred square miles of an alien world, complete with canyons, obstacles, changing weather patterns, friendly MECHs, and enemy MECHs. The consumer operates the MECH's weapons system through various triggers and buttons on both a joystick as well as on auxiliary instrument panels throughout the cockpit. The game is completely interactive with play determined by the strategies and tactics of up to eight different consumers participating in the same battle simulation. (Weisman Tr. 319–28; Babcock Dep.).

46. The BATTLETECH Center not only utilized the characters, storylines, images, designs, descriptions and characteristics created and developed by FASA for BATTLE-TECH, it also added to that continually evolving universe. (Weisman Tr. 310–40; Lewis Decl.).

47. Virtual World Entertainment offers the BATTLETECH game at the BATTLE-TECH Center and at Virtual World Centers pursuant to a license from FASA. (Weisman Tr. 332–39).

48. The BATTLETECH virtual reality game is currently featured at Virtual World Centers located in San Francisco, San Diego, Houston, Las Vegas, Atlanta, Sydney, Australia, Tokyo and Yokohama, Japan. (Weisman Tr. 335).

49. Since the opening of The BATTLE-TECH Center, Virtual World Entertainment estimates that its sales attributable to BATT-LETECH exceed $5,000,000. (PX 402–08; Weisman Tr. 408).

50. The image of the Mad Cat is featured prominently on signs both inside and outside The BATTLETECH Center and Virtual World Centers. The image of the Mad Cat is also used extensively in promotional literature (for FASA and these Centers), which receives wide distribution throughout the United States. In addition, the Mad Cat has been fully incorporated into the BATTLE-TECH game systems and appears numerous times in source books, supplements, rules manuals and technical readouts as well as on posters, pins and other BATTLETECH products. (PX 95; Weisman Tr. 336–37; Lewis Decl.).

51. Since the opening of The BATTLE-TECH Center, BATTLETECH and the BATTLETECH virtual reality game have received extensive unsolicited media coverage. BATTLETECH has been featured in television coverage on national· news and entertainment programs, and in articles in the *New York Times, Wall Street Journal, Los Angeles Times, Chicago Tribune, Time Magazine, Sports Illustrated, Business Week* and *Entertainment Weekly,* among hundreds of others. (PX 400–01; Weisman Tr. 321–28; Morris Decl.).

52. As Virtual World Entertainment promoted BATTLETECH through its virtual reality game, FASA created and introduced 28· new BATTLEMECHs in 1990. Joel Biske, a FASA employee, created Axman, Caesar, Grand Dragon, Hatamoto–Chi and Wolf Trap. Dana Knutson, FASA's Art Director, created Annihilator, Katana, Mercury and Nightsky. Jim Nelson, a FASA employee, created the Clan Elemental suit, Guillotine and Mauler. Steve Venters, an independent contractor hired by FASA, translated the computer images of the Mad Cat, Loki, Thor and Vulture, into full scale designs. The original designs from Biske, Knutson, Nelson and Venters were all first published · in the BATTLETECH *Technical Readout 3050* released in April of 1990. (PGX 7B; PX 96, 115, 122, 124, 128; Lewis Decl.; Biske Decl.; Knutson Decl.; Venters Decl.).

53. The Clan Elemental suit (depicted in Appendix G) was created to look humanoid, unusual and distinct from anything else in the BATTLETECH universe. (Nelson Decl.). However, the Clan Elemental Suit borrows heavily from various prior powered body suits including specifically the Storm Trooper suit, which was first used in 1976

during the initiation of the Star War trilogy movies. (DX 501; Macek Tr. 1104–05; Rovin Decl.; Appendix G).

54. In addition to *Technical Readout 3050* (PGX 7B), FASA created and introduced eight new BATTLETECH products in 1990 (PGX 7; PX 94):

*4th Succession War,* a scenario book, in Jan., 1990 (PGX 6L)

*Lethal Heritage,* a novel, in Feb., 1990 (PGX 7A)

*The Battle for Twycross,* a scenario book, in June, 1990 (PGX 7C)

*THE BATTLETECH Compendium,* a rule book, in July, 1990 (PGX 7E)

House and Clan Patches, an accessory, in July, 1990 (PGX 7D)

BATTLETECH Reinforcements 2, a game accessory in Sept., 1990 (PGX 7F)

*Blood Legacy,* a novel, in Nov., 1990 (PGX 7G)

*More Tales of the Black Widow,* a scenario book, in Nov. 1990 (PGX 7H).

Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH product, including on occasion FASA's interpretations of several of the designs licensed from TCI. Each product contained a proper copyright notice.

55. *The BATTLETECH Compendium,* a comprehensive rulebook released in 1990, received the 1990 ORIGINS Award for Best Miniature Rules. (Lewis Decl.).

56. In 1991, FASA added another fourteen original MECH designs to the BATTLETECH universe, four of which were created by Kadakowa Shoten, FASA's Japanese licensee. In addition, Jeff Laubenstein, a FASA employee, created Cudgel, Daedaeus, Juggernaut, Longshot, Onslaught, Paladin, Mantis and Ronin. All of these MECHs were featured in a new BATTLETECH boxed game called SOLARIS VII (PGX 8M). Dana Knutson, FASA's Art Director, also created Excalibur and Spartan in 1991 for a scenario book entitled *Rhonda's Irregulars* (PGX 8N). (PX 96, 115; Lewis Decl.; Laubenstein Decl.; Knutson Decl.).

57. In 1991, FASA created and published 18 new products for the BATTLETECH universe (PGX 8; PX 94):

BATTLETECH OmniMech Blueprints, an accessory, in Jan., 1991 (PGX 8A)

BATTLETECH Map Set # 3, a game accessory, in Feb., 1991 (PGX 8B)

BATTLETECH Record Sheets: Vol. 1, a game accessory, in March, 1991 (PGX 8C)

*House Marik,* a source book, in April, 1991 (PGX 8D)

BATTLETECH Record Sheets: Vol. 2, a game accessory, in April, 1991 (PGX 8E)

BattleTech Map Set # 4, a game accessory, in May, 1991 (PGX 8F)

BATTLETECH Record Sheets: Vol. 3, a game accessory, in July 1991 (PGX 8G)

Assault Record Sheets: Vol. 4, a game accessory, in Aug., 1991 (PGX 8H)

*Mechwarrior—2nd Edition,* a rule book, in Aug., 1991 (PGX 8I)

*Lost Destiny,* a novel, in Sept., 1991 (PGX 8K)

*Way of the Clans,* a novel, in Sept., 1991 (PGX 8J)

*Wolf Clan Sourcebook,* a source book, in Oct., 1991 (PGX 10Q)

*Blood Name,* a novel, in Oct., 1991 (PGX 8L)

*Solaris VII,* a boxed game, in Nov., 1991 (PGX 8M)

*Rhonda's Irregulars,* a scenario book, in Nov., 1991 (PGX 8N)

BATTLETECH Reinforcement Record Sheets, a game accessory in Dec., 1991 (PGX 8P)

*Falcon Guard,* a novel, in Dec., 1991 (PGX 8Q)

Clan Troops, a game accessory, in Dec., 1991 (PGX 8R).

Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH products, including, on occasion, FASA's interpretations of several of the designs licensed from TCI. Each product contained a proper copyright notice and complied with all statutory copyright formalities. (Lewis Decl.).

58. FASA commissioned the creation of over 70 original MECH designs in 1992 and 1993. At least 55 of these new original MECH designs first appeared in a new

source book entitled *Technical Readout 3055* (PGX 9E), and sixteen of these designs were created by FASA's Japanese licensee, JVC. These new MECH designs were the original creations of three FASA employees: Joel Biske, Dana Knutson and Mike Nielson. Biske created Cerberus, Gunslinger, Hitman, Tempest and Wraith. Knutson created Anvil, Apollo, Bandersnatch, Battle Hawk, Berserker, Daikyu, Daimyo, Dart, Falconer, Gallowglas, Grim Reaper, Hammer, Hercules, Huron Warrior, Jackal, Komodo, Linebacker, Penetrator, Phantom, Pouncer, Salamander, Scarabus, Snake, Stealth, War Dog and Watchman, Epimetheus, Prometheus, Wildfire, Spector and Starslayer. Mike Nielson created Albatross, Devastator, Grand Titan, Rakshasa, Thunder and Venom. (PX 96; Lewis Decl.; Biske Decl.; Knutson Decl.).

59. In 1992, FASA created and released 12 new BATTLETECH products (PGX 9; PX 94):

*Objective Raids,* a source book, in Jan. 1992 (PGX 9B)

*Unbound,* a scenario book, in Jan. 1992 (PGX 9A)

*Bloodright,* a scenario book, in March, 1992 (PGX 9C)

*Wolfpack,* a novel, in April, 1992 (PGX 9D)

*Technical Readout 3055,* a source book, in May, 1992 (PGX 9E)

*Mercenary's Handbook,* a source book, in June, 1992 (PGX 9F)

*Natural Selection,* a novel, in June, 1992 (PGX 8S)

*McCarron's Armored Cavalry,* a scenario book, in July, 1992 (PGX 9G)

*Jade Falcon,* a source book, in July, 1992 (PGX 9H)

BATTLETECH Record Sheets: 3055, a game accessory, in Aug., 1992 (PGX 9I)

*Comstar,* a source book, in Oct., 1992 (PGX 9K)

*Null Set,* a scenario book, in Nov., 1992 (PGX 9J).

Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH products, including, on occasion, FASA's interpretations of several of the designs licensed from TCI. Each product contained a proper copy-right notice and complied with all statutory copyright formalities. (Lewis Decl.).

60. In 1993, FASA added 6 new MECHs to the BATTLETECH universe. FASA employee Mike Nielson created Sasquatch, Werewolf, Cauldron–Born, Hankyu, Nobori–Nin and Copperhead. (Knutson Decl., Lewis Decl.).

61. In 1993, FASA created and released 15 new BATTLETECH products (PGX 10; PX 94):

BattleMechs, a game accessory, in Feb. 1993 (PGX 10A)

*Ideal War,* a novel, in March, 1993 (PGX 10B)

*BATTLETECH Intelligence Operation Handbook,* a source book, in March, 1993 (PGX 10C)

*Blood of Heroes,* a novel, in May, 1993 (PGX 10D)

BATTLETECH ROC Poster, a poster, in July, 1993 (PGX 10E)

BattleMech Recognition Cards, a game accessory, in July, 1993 (PGX 10F)

*Assumption of Risk,* a novel, in July, 1993 (PGX 10G)

*Day of Heroes,* a scenario book, in July, 1993 (PGX 10H)

BATTLESPACE, a boxed game, in Aug., 1993 (PGX 10J)

*Far Country,* a novel, in Aug., 1993 (PGX 10K)

Solaris: The Reaches, a game accessory, in Sept. 1993 (PGX 10L)

BATTLETECH, 3rd Edition, a boxed game, in Sept., 1993 (PGX 10M)

Vehicle Record Sheets, a game accessory, in Oct., 1993 (PGX 10N)

*Hot Spots,* a scenario book, in Oct., 1993 (PGX 10P)

*Luthien,* a scenario book, in Dec., 1993 (PGX 10Q).

Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH products, including, on occasion, FASA's interpretations of several of the designs licensed from TCI. Each product contained a proper copy-right notice and complied with all statutory copyright formalities. (Lewis Decl.).

62. The Third Edition of the BATTLE-TECH Game, released in 1993, received the

ORIGINS Award for Best Graphic Presentation of a Board Game. (PGX 10M, Lewis Decl.).

63. In 1994, FASA created and released 14 new BATTLETECH products containing more new original MECH designs (PGX 11; PX 94):

4th OmniMech Poster Set, an accessory, in Feb., 1994 (PGX 11A)

*D.R.T.–Dead Right There*, a novel, in March, 1994 (PGX 11B)

*BATTLETECH Tactical Handbook*, a rule book, in March, 1994 (PGX 11C)

BATTLETECH 1994 Posters, an accessory, in March, 1994 (PGX 11D)

*Main Event*, a novel, in May, 1994 (PGX 11E)

*Technical Readout 3057*, a source book, in June, 1994 (PGX 11F)

*Tukayyid*, a scenario book, in July, 1994 (PGX 11G)

*Close Quarters*, a novel in July, 1994 (PGX 11H)

*BATTLETECH Compendium: Rules of Warfare*, a rule book, in July, 1994 (PGX 11J)

*Bred for War*, a novel, in Aug., 1994 (PGX 11K)

*Royalty & Rogues*, a scenario book, in Oct., 1994 (PGX 11M)

*The Black Thorns*, a scenario book, in Nov., 1994 (PGX 11P)

*The Invading Clans*, a source book, in Nov., 1994 (PGX 11N)

CityTech—2nd Edition, a boxed game, in Dec., 1994 (PGX 11Q).

Each product contained original text and/or artwork and sometimes incorporated text or art from previous BATTLETECH products, including, on occasion, FASA's interpretations of several of the designs licensed from TCI. Each product contained a proper copyright notice. (Lewis Decl.).

64. In 1994, FASA added 9 new MECHs to the BATTLETECH universe. FASA employee Nielson created Grendel, Kingfisher, Shadow Cat, Shootist, Grizzly, Kodiak, Piranha, Super Nova and Thresher.

65. Since 1985, FASA has licensed and continues to actively license aspects of the BATTLETECH universe to third parties for use in the creation, development, manufacturing, publication and distribution of additional BATTLETECH products. Licensees have included: Ral Partha for lead and pewter miniature models (since 1985) (PX 27–32); Nova games for flip books (1987) (PX 35); Pacific Rim Publishing for BattleTechnology Magazines (since 1987) (PX 40, 41, 45, 56); Activision/Mediagenic for computer disk games (since 1987) (PX 36, 42, 46); Shield Laminating for personnel files (1988) (PX 43); ESP/Virtual World Entertainment for virtual reality simulation games (since 1987) (PX 61); New American Library, and ROC/Penguin Books for novels (since 1990) (PX 48, 51, 63); Kesmai for on-line games (since 1991) (PX 55); Horizon for a Mad Cat vinyl model (1992) (PX 59); Tyco for BATTLETECH toys (since 1993) (PX 64); and Saban Entertainment for a BATTLETECH animated series (since 1993). (Lewis Decl.).

### C. *Sales Of The BATTLETECH Property*

66. FASA's domestic sales of BATTLETECH products since 1984 exceed $13 million. (PX 72, 73, 73A; Lewis Decl.; Lewis Tr. 755). FASA has sold approximately 234,000 basic BATTLETECH role playing games.

67. Domestic sales of BATTLETECH novels by FASA licensee ROC/Penguin Books since 1991 total $2.3 million. (PX 75; Lewis Decl.).

68. Domestic sales of miniature lead or pewter models of BATTLETECH MECH designs by FASA licensee Ral Partha since 1985 total $4.8 million. (PX 76; Lewis Decl.).

69. Domestic sales of BATTLETECH computer games by FASA licensee Activision/Mediagenic since 1987 exceed $5 million. (PX 77; Lewis Decl.).

70. Domestic sales of BATTLETECH on-line games by FASA licensee Kesmai since 1991 total $1.2 million. (PX 78; Lewis Decl.).

71. Since 1987, FASA has also executed agreements to distribute BATTLETECH products worldwide. Distributors include: Jedko for Australia and New Zealand (since

1987) (PX 65); TM Games (England) (since 1988); Fantasy Products (Germany) (since 1988) (PX 66); Disenos Orbitales (Spain) (1990–93) (PX 67); Olive Books of Israel (Israel) (since 1990) (PX 68); Publicacoes (Portugal) (since 1991) (PX 69); Kadakowa Shoten (Japan) (since 1992); Zinco (Spain) (since 1993); and Jeux Descartes (France) (since 1993). (Lewis Decl.).

72. Japanese sales of BATTLETECH products since July of 1992 exceed an estimated $1 million. (PX 79; Lewis Decl.).

73. In the ten years since its introduction, BATTLETECH has been the subject of countless advertisements placed by FASA in science fiction and game publications. It has also been featured in articles and reviews appearing regularly in those publications. (PGX 71; PX 795; Lewis Decl.; Morris Decl.; Doctorow Decl.; Weisman Tr.; Babcock Dep.; M. Weisman Dep.).

74. In the ten years since the introduction of BATTLETECH, FASA has published and distributed throughout the United States yearly catalogues (with additional seasonal updates) featuring BATTLETECH products as well as promotional brochures and posters for the general public and trade. (PGX 12, 13, 18; J. Weisman Tr. 370–85; Lewis Decl.).

75. BATTLETECH products have also been featured in catalogues and promotional materials distributed throughout the United States by its licensees, including ROC/Penguin Books, Ral Partha and Activision. (PGX 14, 16, 17; PX 15; Lewis Decl.).

### D. Recognition of BATTLETECH Among the Relevant Consumers

76. At the present time, the BATTLETECH game is primarily enjoyed by male enthusiasts between the ages of 12 and 22 who are highly literate. With the distribution of the BATTLETECH game in computer software and other media, the starting age and level of education for players may eventually be lower.

77. FASA sponsors a BATTLETECH fan club for game enthusiasts, which has had as many as 3,000 members at a time in the United States alone.

78. FASA sponsors tournaments and events at annual gaming conventions around the country, the largest of which draws as many as 20,000 attendees.

79. FASA stays in very close contact with its fans, fielding questions and comments by mail, telephone and on-line services from approximately 5,000 individuals each year. A new Internet home page location sponsored by VWE for the BATTLETECH game currently is receiving approximately 3,000 "visits" each week.

### E. Originality and Distinctiveness of the BATTLETECH Property

80. FASA's BATTLETECH universe is composed of a large number of diverse MECH designs. (PX 186). Unlike the Japanese giant robot genre, which has only one category of giant robot, FASA'S MECH designs fall into the general categories of BATTLEMECH and OMNIMECH, each of which may be divided into four types: light, medium, heavy and assault. Each is portrayed as realistically being able to perform in accordance with detailed specifications, allowing the player to temporarily suspend his or her disbelief within the fictional setting.

81. FASA's BATTLETECH universe places these diverse designs in the context of a science fiction story with a unique combination of elements. While other science fiction works have included futuristic battle involving giant warrior robots piloted by conventional (i.e., hand and foot) controls or plug-in connections, the BATTLETECH MECHWARRIORs control their MECHs through a hybrid of neural link (i.e., brain waves) and conventional controls.

82. Philip Johnson of Leo J. Shapiro and Associates, Inc. conducted a survey of 200 consumers of role playing and other games. The survey sample was limited to role playing and virtual reality game players from around the country, a group estimated to be approximately two to three million individuals. (Johnson Decl.; PX 145). Ninety percent of the respondents purchased a model, toy, figurine, or miniature in the past two years and/or expect to do so in the coming two years. (Id.).

83. Each respondent of the Johnson survey was shown elements of the BATTLE-TECH property that FASA believes have acquired secondary meaning, including the setting in which the story takes place, the robotic vehicles that are used for fighting, and the MECHWARRIORs and Clan Elementals who pilot these craft. (PX 415). The questionnaire and interviewing procedures of the survey design were conducted in accordance with generally-accepted standards of objective procedure and survey technique. The interviewing methodology was a "double-blind" design, whereby neither the respondents nor the interviewers knew the purpose of the study. (PX 415; Johnson Decl.). However, the Court notes that this survey was specifically limited by FASA to role playing, virtual reality game players. (Johnson Tr. 826–31; Mantis Decl.).

84. Overall, two out of three (67%) of the survey participants identified BATTLE-TECH/FASA as the source of the elements depicted in the exhibit that they were shown. This level of source identification indicates that there is some secondary meaning for the elements that are used in the BATTLE-TECH property, including the setting in which the story takes place, the robotic vehicles that are used for fighting, and the MECHWARRIORs and Clan Elementals who pilot these craft. (PX 415; Johnson Decl.).

### F. Copyright Registrations

85. FASA is the owner of the following Certificates of Registration from the United States Copyright Office, among many others, issued more than five years after first publication of the work: [3]

(a) TX–3–524–175—*BattleTech: A Game of Armored Combat Second Edition* (PX 110)

This boxed game was the first product to carry the BATTLETECH name when it was released in 1985. The scope of this copyright includes the game mechanics and statistics, fictional text and artwork which depict the history of the BATTLETECH universe, including, among other things, the MECHs, the neural link and hand/foot controls for piloting the MECHs, the weaponry, and the pirates on the edge of known space (the "Periphery"). All of the MECHs included in this work are FASA renditions of the Japanese images licensed from Twentieth Century Imports (the "TCI designs").[4]

(b) TX–3–679–891—*CityTech: The Battle-Tech Game of Urban Combat* (PX 111)

This boxed game, released in 1986, provides specialized rules for playing the BATTLETECH game in an urban environment. The scope of this copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also covers three original FASA MECH designs: Hunchback, Spider and Stalker. The playing pieces for the game reflect both the original FASA MECHs as well as the TCI designs.

(c) TX–3–616–379—*BattleTech Technical Readout 3025* (PX 103)

This source book, released in 1986, was the first "technical readout," describing and illustrating MECHs, vehicles, and spacecraft from the 3025 era. The scope of this copyright includes the fictional text, artwork and game statistics new to this work as well as fictional text, artwork and game statistics created by FASA for other BATTLETECH products and included in this work. The copyright also covers new MECHs created by FASA (Assassin, Atlas, Awesome, Banshee, Blackjack, Catapult, Centurion, Charger, Cicada, Clint, Commando, Cyclops, Dervish, Dragon, Enforcer, Firestarter, Grasshopper, Hatchetman, Hermes II, JagerMech, Javelin, Jenner, Orion, Panther, Quickdraw, Trebuchet, UrbanMech, Valkyrie, Victor,

---

3. The fact that some of FASA's Certificates of Registrations are more than five years old did not affect any of the evidentiary conclusions reached in this opinion. See 17 U.S.C. § 410(c).

4. These TCI designs or FASA's renditions of the TCI designs were not at issue in this litigation.

Vindicator, Vulcan, Whitworth and Zeus) along with other vehicles and spacecraft.

(d) TX–3–626–452—*Mechwarrior: The BattleTech Role Playing Game* (PX 105)

This book was released in 1986 and provides the rules for role playing in the BATTLETECH universe in the 3025 era. The scope of this copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also covers several MECH designs original to FASA as well as uniforms, equipment and weapons.

(e) TX–3–748–839—*BattleForce: Small Unit Actions in the 31st Century* (PX 109)

This boxed game was released in 1987 and allows the player to take the role of battalion or regimental commander in the 3025 era. The scope of this copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLE-TECH products and included in this work. The copyright also covers the original FASA MECH designs of Atlas and Cicada, as well as a heavy tank, on the front of the box. The cardboard playing pieces represent groups of MECHs or other combat units bearing the military symbols of their units.

(f) TX–3–624–571—*BattleTech Manual: The Rules of Warfare* (PX 107)

This book, released in 1987, is a compilation of the rules of the BATTLETECH, CITYTECH and AEROTECH games, plus additional optional rules, set in the year 3025. The scope of this copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also includes the original FASA MECH, Atlas, which is featured on the cover. For purposes of this litigation, the scope of this copyright does not include any of FASA's renditions of the TCI designs which may be depicted in this work.

(g) TX–3–626–905—*BattleTech Technical Readout 3026 (Vehicles and Personal Equipment)* (PX 106)

This source book, released in 1987, is the second "technical readout," describing the vehicles and personal equipment in the BATTLETECH universe in the year 3026. The scope of this copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also includes the exoskeleton mechanical hardware created by FASA as a precursor to the Elemental suit.

86. FASA is the owner of the following Certificates of Registration from the United States Copyright Office, among many others, issued within five years after first publication of the work:

(a) TX–3–685–465—*BattleTroops: A Game of Urban Man-to-Man Combat in the BattleTech Universe* (PX 108)

This boxed game was released in 1989 and allows the player to simulate man-to-man infantry combat in the BATTLE-TECH universe in the 3025 era. The scope of the copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also includes the cover art depicting infantry and a destroyed MECH on the battlefield. For purposes of this litigation, the scope of this copyright does not include any of FASA's renditions of the TCI designs that may be depicted in this work.

(b) TX–3–631–325—*BattleTech Technical Readout 2750* (PX 102)

This source book, released in 1989, is the third "technical readout," describing and illustrating MECHs, vehicles and spacecraft from the Star League era. The scope of the copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also covers numerous MECHs created by FASA (Black Knight, Champion, Crab, Crockett, Exterminator, Flashman, Hermes, Highlander, Hussar, King Crab, Kintaro, Lancelot, Mongoose, Sentinel, Thorn, Thug, Wyvern) along with other aerospace fighters, combat vehicles, warships and personal equipment. For purposes of this litigation, the scope of this copyright does not include any of FASA's renditions of the TCI designs that may be depicted in this work.

(c) TX–3–478–047—*BattleTech Technical Readout 3050* (PX 100)

This source book, released in 1989, is the fourth "technical readout", describing and illustrating MECHs from the 3050 era when the Clans and their technology from the Periphery have invaded the Universe. The scope of the copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also covers numerous MECHs created by FASA (Falcon, Firefly, Flea, Hoplite, Hornet, Imp, Shogun, Wolfhound, Axman, Grand Dragon, Hatamoto–Chi, Wolf Trap, Annihilator, Caesar, Katana, Mercury, Night Sky, Elemental, Guillotine, Mauler, Vulture, Koshi, Loki, Mad Cat, Man O' War, Masakari, Puma, Ryoken, Thor and Uller). For purposes of this litigation, the scope of this copyright does not include any of FASA's renditions of the TCI designs that may be depicted in this work.

(d) TX–3–478–044—*BattleTech: The Return of Kerensky The Clans are Coming (Poster)* (PX 97)

The scope of the copyright for this poster, released in 1990, includes the design and depiction of the Mad Cat OMNI-MECH which it features.

(e) TX–3–478–045—*The BattleTech Compendium* (PX 98)

This rule book, released in 1990, is a compilation of all the rules included in the boxed games of BATTLETECH, CITYTECH and AEROTECH, as well as additional optional rules and fiction relating to the Clan invasion. The scope of this copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also includes the Mad Cat MECH and an Elemental suit featured on the cover as well as the descriptions and depictions of the Mad Cat, Elemental suit, Thor, Vulture and Ryoken MECHs within the book. For purposes of this litigation, the scope of this copyright does not include any of FASA's renditions of the TCI designs that may be depicted in this work.

(f) TX–3–478–048—*BattleTech Wolf Clan Sourcebook* (PX 101)

This reference book, released in 1991, adds to the fiction surrounding the Clans in general and the Wolf Clan in particular. The scope of this copyright includes the game statistics, fictional text and artwork new to this work as well as game statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also includes the culture and military organization of the Wolf Clan as well as the eugenics warrior breeding program and the societal caste system story elements. In addition, the copyright covers four new MECH designs created by FASA for this work (Linebacker, Naga, Phantom and Pouncer).

(g) TX–3–478–046—*Mechwarrior The BattleTech Role Playing Game (Second Edition)* (PX 99)

This rule book, released in 1991, provides the rules for role playing in the BATTLETECH universe in the 3050 era. The scope of this copyright includes the fictional text, artwork and game mechanics and statistics new to this work as well as game mechanics, fictional text, artwork and game mechanics and statistics created by FASA for other BATTLETECH products and included in this work. The copyright also includes the Vulture, an original FASA MECH design, together with the interior of a MECH cockpit, on the cover, the illustration of the Mechwarrior neural helmet and the designs of the MECHs and OMNIMECHs depicted therein.

(h) TX–3–738–363—*BATTLETECH Solaris VII: The Game World* (PX 112)

This boxed game, released in 1991, allows the player to simulate gladiatorial MECH combat on the planet of Solaris VII. The scope of this copyright includes the fictional text, artwork and game mechanics and statistics new to this work as well as game mechanics, fictional text, artwork and game mechanics and statistics created by FASA for other BATTLETECH products and included in this work. The copyright also covers four new MECH designs created by FASA licensee, Kadakowa Shoten, including Colossus, Koto, Morpheus and Tsunami, as well as eight MECH designs created by FASA (Cudgel, Daedalus, Juggernaut, Longshot, Onslaught, Paladin, Mantis and Ronin).

(i) TX–3–664–382—*BATTLETECH Technical Readout: 3055* (PX 104)

This source book, released in 1992, is the fifth "technical readout," describing and illustrating additional MECHs from the 3050 era. The scope of the copyright includes the game mechanics and statistics, fictional text and artwork new to this work as well as game mechanics and statistics, fictional text and artwork created by FASA for other BATTLETECH products and included in this work. The copyright also covers the design and depiction of numerous MECHs created by FASA (Anvil, Apollo, Bandersnatch, Battlehawk, Berserker, Daikyu, Daimyo, Dart, Falconer, Gallowglas, Grim Reaper, Hammer, Hercules, Hitman, Huron Warrior, Jackal, Komodo, Linebacker, Penetrator, Salamander, Scarabus, Snake, Stealth, Tempest, War Dog, Watchman, Albatross, Grand Titan, Hollander, Naginata, Rakshasa, Thunder and Venom) as well as the designs and depictions of MECHs created by FASA licensee, Victor Musical Industries ("JVC") (Baboon, Behemoth, Galahad, Goshawk, Hellhound, Jenner IIC, Kraken, Peregrine, Viper, Vixen).

87. With the exception of the original models and images obtained from TCI, all BATTLETECH images, designs and products, including the characters, designs, fictional text, statistics and other features, were created by FASA employees or independent contractors under agreements with FASA that make FASA the sole owner of all rights to BATTLETECH products and the BATTLETECH universe.

## II. CONCLUSIONS OF LAW—Phase Two

### A. *FASA Has Established Original Expressions Of Ideas That Are Protected By The Copyright Act*

1. To prevail on its claims of copyright infringement FASA must, in the first instance, prove ownership of a valid copyright. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). A copyright registration certificate, when issued within five years of publication of the work, constitutes *prima facie* evidence of ownership of a valid copyright. *See* 17 U.S.C. § 410(c). As pages 29 through 34 of this opinion illustrate, FASA has produced these certificates for some of its designs. The burden is therefore on Playmates to rebut the presumption that FASA is the rightful owner of valid copyrights. In this case, FASA's ownership of the pertinent copyrights and the validity of these copyrights have not been directly chal-

**1146**

lenged. Instead, Playmates challenges both the nature and scope of FASA's copyright protections. Thus, this case requires this Court to determine the scope of copyright protection to be afforded FASA's MECH designs.

■ 2. 17 U.S.C. § 106 provides owners of copyrighted works the exclusive rights "to reproduce the copyrighted work in copies," "to prepare derivative works based upon the copyrighted work," and "to authorize the preparation of derivative works or copies." 17 U.S.C. § 106(1), (2). The transfer of a work to a different medium does not lessen the copyright protection in the original work. *Atari, Inc. v. North American Philips Consumer Elec. Corp.,* 672 F.2d 607, 618 n. 12 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). Thus, any illegal copying, even so-called intermediate or derivative copying has been held to violate the copyright act. *Sega Enter. Ltd. v. Accolade, Inc.,* 977 F.2d 1510 (9th Cir.1992).

■ 3. As this Court noted in *FASA I,* the protection afforded by the copyright laws is not absolute because the copyright protects only the expression of ideas, not the ideas themselves. 869 F.Supp. at 1347 (citations omitted). Additionally, "copyright protection does not extend to *scenes a faire*— that is, the incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." 869 F.Supp. at 1348 (citations omitted). At trial, in accord with this Court's opinion in *FASA I,* FASA did not claim copyright protection in the following unprotectible ideas and concepts: (a) a futuristic, interstellar, battle dominated universe; (b) genetically manipulated warriors seeking to conquer mankind; (c) use of massive, robot-like battle machines; (d) use of computer and weapons systems that communicate directly with the pilot's brain; (e) designation of robots into light and heavy categories; and (f) the use of break-away parts to simulate battle damage. *See generally FASA I,* 869 F.Supp. at 1351–1353. Essentially, when FASA copyrighted its particular expressions of robotic tank-like vehicles that exist in a futuristic combat world it did not prevent others from using these general ideas.

FASA only prevented others from copying those arbitrary design features that make its expression of this general idea unique. *See Atari, Inc. v. Amusement World, Inc.,* 547 F.Supp. 222, 227 (D.Md.1981) (finding that defendant's video game "Meteors" was not substantially similar to and was not an infringing copy of plaintiff's "Asteroids" game); *Ideal Toy Corp. v. Kenner Prods. Div. of Gen. Mills Fun Group, Inc.,* 443 F.Supp. 291, 304 (S.D.N.Y.1977) (noting that a fictional theme or concept is not protectible).

4. In discussing the non-protection that general *scenes a faire* receive, the Seventh Circuit Court specifically noted that as a work embodies more in the way of particularized expression and moves further away from general expression, it receives broader copyright protection. The broadest protection is given to the " 'strongest' works in which fairly complex or fanciful artistic expressions predominate over relatively simplistic themes and which are almost entirely products of the author's creativity rather than concomitants of those themes." *Atari, Inc.,* 672 F.2d at 617. (citations omitted).

■ 5. A related concept is that of idea-expression unity: where idea and expression are indistinguishable, the copyright will protect against only identical copying. *Atari, Inc. v. North American, Philips Consumer Elec. Corp.,* 672 F.2d at 616. No simple rule exists for distinguishing ideas from their expression. *See, e.g., Sassafras Enters., Inc. v. Roshco, Inc.,* 889 F.Supp. 343, 346 (N.D.Ill. 1995).

■ 6. The *sine qua non* of copyright is originality. To qualify for copyright protection a work must be original to the author. *Feist Publications,* 499 U.S. at 345, 111 S.Ct. at 1287; 17 U.S.C. § 102. *See generally* 1 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT [hereinafter "NIMMER ON COPYRIGHT"] § 2.01 (1981). "Original, as the term is used in copyright, means only that the work was independently created by the author ... and that it possesses at least some minimal degree of creativity." *Feist Publications,* 499 U.S. at 345, 111 S.Ct. at 1287. The requisite level of creativity is extremely low; even a slight amount will

suffice. *Id.* Novelty or uniqueness is not a requirement for copyright protection, and "the search for prior art that frequently goes into a challenge to a patent plays no part in a copyright case." 2 NIMMER ON COPYRIGHT § 2.01[A] n. 11; *See also Laureyssens v. Idea Group, Inc.*, 768 F.Supp. 1036 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 964 F.2d 131 (2d Cir.1992). Therefore, it was not sufficient to defeat FASA's copyright protection for Playmates to merely submit evidence of prior similar works. 3 NIMMER ON COPYRIGHT § 12.11[B]; *R. Dakin & Co. v. A & L Novelty Co.*, 444 F.Supp. 1080 (S.D.N.Y. 1978).

7. Although the originality concept defies exact definition, the test of originality has been described as "modest," "minimal," and a "low threshold." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908–11 (2d Cir. 1980). Perhaps the most frequently quoted formulation of originality was first written by the Second Circuit:

> All that is needed ... is that the "author" contributed more than a "merely trivial" variation, something recognizably "his [or her] own." Originality in this context "means little more than a prohibition of actual copying." No matter how poor artistically the "author's" addition, it is enough if it be his [or her] own.

*Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102–03 (2d Cir.1951).

■ 8. Where, as here, the Court is comparing products that have both protectible and unprotectible elements, we must exclude comparison of the unprotectible elements from the application of the ordinary observer test. *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 141 (2nd Cir.1992) (referred to as "the more discerning ordinary observer test"). Thus, it is critical for this Court to preliminarily focus on whether FASA's MECH designs have any protectible or "artistic" aspects. This was the focus of the Court during Phase II of the trial.

■ 9. FASA urges this Court to define the scope of its copyright rights by making a side-by-side comparison with Playmates' EXO–SQUAD Toys. This type of simplistic comparison is improper. As this Court's esteemed colleague, Judge Shadur, has precisely determined:

> It is true, of course, that the suggested type of side-by-side comparison is really not the right one to make. Rather, the trick is to begin with the allegedly aggrieved work in one hand and nothing in the other hand and ask "Is it copyrightable? And if so, in what respects? To what extent?" Those limiting questions define whether a comparison need to be made at all and, if so, also defines the universe for such a comparison.

*Sassafras Enters.*, 889 F.Supp. at 348 (footnotes omitted). It is precisely for these reasons that this Court drew the distinctions between Phases II (rights) and III (infringement) of this trial.

■ 10. The copyright protection accorded to derivative works is limited to that portion of the work adding incremental originality beyond the preexisting work. *Sassafras Enters.*, 889 F.Supp. at 348.

■ 11. The only aspects of FASA's MECH figures that are entitled to copyright protection are the non-trivial, original features, if any, contributed by the authors as creators of these works. *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2nd Cir.1980).

12. In this case, Playmates asserts that FASA is seeking protection of general ideas that are *scenes a faire* when viewed in the light of the robotic toy design industry. Additionally, Playmates asserts that FASA's copyright claims must fail because they do not add *any* incremental originality beyond preexisting robotic MECH designs. The Court specifically rejects the broad brush of both of these arguments.

13. In the Final Pretrial Order submitted one month before trial, FASA waived all claims based on various preexisting designs, including designs initially relied upon as the basis for claiming infringement (Battlemaster, Rifleman, Archer, Warhammer, Griffin, Wolverine, Longbow). At trial, FASA also waived claims based on other designs initially relied upon (Rifleman II, Behemoth). At the conclusion of Phase II of the trial, at the instigation of the Court, FASA filed a court

pleading which indicated that it believed it had established that 167 of its designs were protected by both the copyright and trademark laws.

14. During Phase III of the trial, FASA reduced the number of allegedly proposed "infringing" E–Frames to either seven, as claimed in FASA's Findings of Fact and Conclusions of Law For Phase III ("Findings"), or six, as claimed in Plaintiffs' Phase III Trial Brief ("Brief"). The number of "infringed" designs was also reduced from thirty to either nine in the Findings or seven in the Brief.

The specific claims are as follows:

FINDINGS

| Allegedly Infringing EXO–SQUAD Design | Allegedly Infringed BATTLETECH Design |
| --- | --- |
| Phaeton | Clan Elemental (Appendix G) |
| Shiva | King Crab (Appendix A) |
| Marsala | Blackhawk (Appendix C) |
| Alec DeLeon | Koshi (Appendix F) |
| | Daishi (Appendix D) |
| Livanus | Blackhawk (Appendix C) |
| | Bushwacker (Appendix H) |
| Maggie | Dasher (Appendix E) |
| Heavy Attack E–Frame | Mad Cat (Appendix B) |

BRIEF

| Phaeton | Clan Elemental (Appendix G) |
| --- | --- |
| Shiva | King Crab (Appendix A) |
| Marsala | Blackhawk (Appendix C) |
| Livanus | Blackhawk (Appendix C) |
| | Bushwacker (Appendix H) |
| J.T. Marsh | Clan Elemental (Appendix G) |
| Heavy Attack E–Frame | Mad Cat (Appendix B) |

15. FASA's Mad Cat and other BATTLEMECHs and OMNIMECHs and the BATTLETECH Universe have incremental originality beyond any preexisting works. In particular, the Court finds that these FASA products are unique because they create robot-like tanks with enclosed cockpits that have a unique personality based on each machine's special weaponry and custom features. This feature of enclosed cockpits with unique personalities, which allows various role-playing, game potential, is not trivial and is an original improvement that is distinct from prior robotic designs.

16. In particular, after careful consideration of all the relevant evidence, the Court finds that the following FASA MECH designs have the requisite incremental originality, in that they create robot-like tanks with cockpits that have a unique personality based on the combination of each machine's special weaponry and action features, and are therefore protected by FASA's copyright registrations: MAD CAT, KING CRAB, BLACKHAWK, DASHER, KOSHI, DAISHI and BUSHWACKER.

17. The Court specifically finds that FASA's Clan Elemental Design is substantially similar to various preexisting works and does not have the requisite incremental originality to be protected by FASA's copyright registrations. FASA's Clan Elemental design is substantially similar to many preexisting works to which its creators had access. The Clan Elemental Design is *scenes a faire* in the robotic design industry. (Rovin Decl.; Siembieda Decl.; Macek Decl.).

18. Much of the total look of BATTLETECH draws heavily from preexisting material that is common in the "mecha" genre and in the public domain. To a certain degree, each new enclosed robotic design will always look like prior existing robotic designs. Thus, the Court specifically finds that the protectible aspects of FASA's copyright are "weak" because a significant part of its total look and the subject matter converge. *Cf. Franklin Mint Corp. v. National Wildlife Art Exchange, Inc.*, 575 F.2d 62, 65 (3rd Cir.), *cert. denied*, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). The scope of FASA's "weak" copyright is narrowly limited to the specific protectible expression embodied in FASA's work.

19. The specific expressions of the MAD CAT, KING CRAB, BLACKHAWK, DASHER, KOSHI, DAISHI and BUSHWACKER designs do not constitute general ideas or *scenes a faire* in the robotic toy design industry.

B. *FASA Has Established That It Has Protectible Trade Dress Rights*

20. FASA's Lanham Act Counts (Counts V & VI) allege infringement of its unregistered trade dress. The Seventh Circuit has described trade dress as referring to the total image of a product, including size, shape, color combinations, graphics, packaging and label. *FASA I*, 869 F.Supp. at 1354. The "trade dress" of a product may inhere in

the design of the product itself. *Id.* A product's trade dress is the overall image used to present it to its purchasers and includes the product's size, shape, color, graphics, packaging and label. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1182 (7th Cir.1987). Trademarks designate the origin and quality of products. *Qualitex Co. v. Jacobson Products Co.,* — U.S. —, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359 (7th Cir.1993); William M. Landes & Richard A. Posner, *Trademark Law: An Economic Perspective,* 30 J.L. & ECON. 265 (1987).

21. The general purpose of Section 43(a) of the Lanham Act "is to reduce the cost of information to consumers by making it easy for them to identify the products or producers with which they have had either good experiences, so that they want to keep buying the product (or buying from that producer), or bad experiences, so that they want to avoid the product or the producer in the future." *W.T. Rogers Co. Inc. v. Keene,* 778 F.2d 334, 338 (7th Cir.1986) (citing *Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 1429–30 (7th Cir.1985)).

22. FASA has not obtained federal trademark registrations for any of its MECH configurations. Thus, in order to prevail on its trade dress infringement claims, FASA initially must prove that its trade dress is protectible by showing that its trade dress is "inherently distinctive" or has acquired "secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 766, n. 4, 112 S.Ct. 2753, 2756 n. 4, 120 L.Ed.2d 615, *rehearing denied,* 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992).

23. A trade dress is inherently distinctive and therefore protectible without proof of secondary meaning if it is "sufficiently distinctive to allow consumers to identify the product from the trade dress." *Computer Care v. Service Sys. Enters., Inc.,* 982 F.2d 1063, 1069 (7th Cir.1992). An inherently distinctive trade dress is protectible under § 43(a) of the Lanham Act without a showing that it has acquired secondary meaning. *Two Pesos* 505 U.S. at 775, 112 S.Ct. at 2761.

24. "To be inherently distinctive, a product configuration-comprising a product feature or some particular combination or arrangement of product features—for which Lanham Act protection is sought must be (i) unusual and memorable; (ii) conceptually separable from the product; and (iii) likely to serve primarily as a designator of origin of the product." *Duraco Prods. v. Joy Plastic Enters.,* 40 F.3d 1431, 1448–49 (3d Cir.1994).

25. "Secondary meaning" means that consumers associate a particular product with a particular producer and desire the product because it signifies that producer. *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d at 659. Thus, in order to establish that its MECH products possess secondary meaning, FASA must prove that the primary significance of its MECH designs in the minds of consumers is to identify them as a FASA product. *See Qualitex Co. v. Jacobson Prods. Co.,* — U.S. —, —, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995).

26. To establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer which produces a product; rather, it is sufficient if the public assumes that the product comes from a single, though anonymous source. *Processed Plastic Co. v. Warner Communications,* 675 F.2d 852, 856 (7th Cir.1982) (affirming district court's conclusion that toy car had secondary meaning associated with television show).

27. In considering whether a mark has acquired secondary meaning, courts generally consider both direct and circumstantial evidence. *FASA I,* 869 F.Supp. at 1355. Direct evidence includes consumer testimony and consumer surveys. *Id.* Circumstantial evidence includes exclusivity, length and manner of use; amount and manner of advertising; amount of sales and number of customers; established place in the market and proof of intentional copying. *Id.* (citations omitted).

28. The Seventh Circuit has noted that trade dress protection when premised on the configuration of the product itself, as is involved in this case, opens up a "can of

worms." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657 (7th Cir.1995). Trade dress protection only protects the features of the product that serve as a signifier of source. Thus, Judge Cummings made the pointed observation that where trade dress protection is sought based on the mere configuration of the product, there is an inherent tension with those features of the product whose value to consumers is intrinsic and not exclusively as a signifier of source. *Id.* at 657. This tension may unduly hinder competition. *See* William M. Landes & Richard A. Posner, *The Economics Of Trademark Law*, 78 TRADEMARK REP. 267 (1988). The *Thomas & Betts* court noted that "trademark law allows a producer to prohibit the copying of a product feature which serves as a signifier of source in order to preserve his reputation and the goodwill consumers have for his brand. On the other hand, effective competition and the penumbra of the patent laws require that competitors be able to slavishly copy the design of a successful product." 65 F.3d at 658. In recognition of this distinction courts require that trade dress that is not inherently distinctive have acquired secondary meaning as a prerequisite to receiving protection.

[25] 29. FASA established at trial that it has advertised and promoted its MECH images for approximately ten years and that it enjoys substantial sales of its products. However, FASA's mere advertising and promotion of its MECH images is not sufficient in itself to establish that its designs have acquired secondary meaning. *Turtle Wax, Inc. v. First Brands Corp.*, 781 F.Supp. 1314, 1318 (N.D.Ill.1991); *Duraco Prod. v. Joy Plastic Enters.*, 40 F.3d 1431, 1453 (3d Cir. 1994).

■ 30. The Court finds that the relevant consumer market for BATTLETECH is a very sophisticated group of game fans who enjoy the mental stimulation of the BATTLETECH fantasy game world. The trade dress of FASA's MECHs and OMNIMECHs have great notoriety and recognition among consumers of role-playing, board, and virtual reality computer games. This is the exact narrow group that was the subject of FASA's survey evidence.

31. The images and designs of the Mad Cat and other BATTLEMECHs and OMNIMECHs are decorative artistic representations conveying the BATTLETECH fiction. The trade dress of the BATTLETECH MECHs have acquired some secondary meaning and are nonfunctional.

32. In light of the extensive and exclusive use of the images and designs of the Mad Cat, other BATTLEMECHs and OMNIMECHs, the significant advertising, licensing and distribution of these images and designs resulting in substantial sales, the Court concludes that these designs have acquired some secondary meaning among a very sophisticated group of game fans who enjoy the mental stimulation of the BATTLETECH fantasy game world.

33. After careful consideration of all the relevant factors, this Court specifically concludes that FASA has established protectible trade dress rights in the following MECH images: The Mad Cat, KING CRAB, BLACKHAWK, DASHER, KOSHI, DAISHI and BUSHWACKER designs. These images have acquired secondary meaning within the relevant public and are specifically associated with FASA's BATTLETECH properties.

■ 34. Because of BATTLETECH's general references to common source and prior works, this Court has concluded that the MECH designs by FASA are not inherently distinctive. The trade dress of FASA's BATTLETECH MECHs and OMNIMECHs draws heavily from preexisting material that is common to the "mecha" genre and in the public domain and is not inherently distinctive.

35. The Court specifically finds that FASA's Clan Elemental design borrows heavily from common source and prior works in the relevant genre and has no secondary meaning and is not inherently distinctive.[5]

---

5. In view of the fact that this Court has found that FASA's Clan Elemental design was not protected by the law, the Court has not compared the Clan Elemental Design to EXO-SQUAD's Phaeton or J.T. Marsh designs in the body of this opinion. However, for completeness of the rec-

## III. FINDINGS OF FACT—Phase Three of Trial

### A. *The Development Of The EXO-SQUAD Toy Line By Playmates*

1. In late 1990 or early 1991, Richard Sallis, the President of Playmates, began work on a hard-edged robotic toy line for Playmates. (Sallis Tr. 1464:4–6). Sallis had previous experience with *Star Wars* toy model kits from when he worked for Parker Brothers in the early 1980s. Additionally, he had worked on the ROBOTECH toy line at Matchbox in the mid 1980s. (Sallis Tr. 2453:10–23).

2. In June, 1991, Sallis attended the annual Tokyo toy fair and reviewed many Japanese robotic designs. (Sallis Tr. 2466:19, 1647:2). Sallis later returned to Japan for specific meetings with Japanese toy makers Takara, Bandai, Tomy and Tsubaraya regarding possible robotic toy lines. (Sallis Tr. 1467:20, 1468:1).

3. In October of 1991, Jerome M. Sachs, the President of an advertising agency working for Playmates, attended a film festival in Europe and met Jane McGregor and Jeff Segal from Universal Cartoon Studios. (Segal Tr. 1696). McGregor and Segal indicated they were developing an animated science fiction series called "Davey Rockett." Sachs offered to arrange a meeting with Richard Sallis from Playmates who was interested in developing a robotic toy line. (Sachs Dep.).

4. On November 15, 1991, Sallis met with Jeff Segal, the President of Universal Cartoon Studios. (Sallis Tr. 1485). Sallis explained that he was interested in a hard-edged, futuristic, animated series that could serve as a basis for a robotic toy line featuring action figures and robotic vehicles with lots of weapons. (Sallis Tr. 1487).

5. In response to a telephone inquiry in late November or early December, 1991, Playmates invited Robert Allen, a Cincinnati toy designer and manufacturer's representative, to present several toy concepts, including BATTLETECH. (Allen Decl.; Allen Tr. 95–96, 102).

6. Unbeknownst to Allen, Playmates had been looking unsuccessfully for a futuristic robot-related toy line for several months. During this time, Playmates had reviewed numerous robot-related materials, including: Transformers (Hasbro); Gobots (Tonka); Star Wars (Kenner); Robotech Macross (Matchbox–Palladium Books); Zoids (Tomy); Z · Knights (Tomy); Voltron (Matchbox); Robo Bloxx (Tyco); Future Copy (Arco); Gundam (Bandai); Samurai Trooper (Sunrise); Spiral Zone (Bandaio); L Gaim (Bandai); Xabungle (Bandai); Aliens (20th Century Fox); Space Marines (Games Workshop); Robot Hunter (Quality Comics); White Dwarf (Games Workshop); Warhammer (Games Workshop); Rifts (Palladium Books); Robotech Sentinels (Matchbox–Palladium Books); Robotech Southern Cross (Matchbox–Palladium Books). (PX 18, 814; Aaronian Tr. 1803–18; Sachs Dep.; Sallis Tr. 1575–84, 1641).

7. On December 10 or 11, 1991, Allen, a consultant to FASA, presented three toy concepts, including BATTLETECH, to Chris Devine Dailey, who at the time was involved only with girls' toys at Playmates. (Allen Decl.; Allen Tr. 26:24–25, 27:1–5). During the thirty minute portion of the meeting that dealt with BATTLETECH, Allen reviewed various BATTLETECH MECHs and left a videotape concerning the BATTLETECH virtual reality center. (Allen Tr. 198). Dailey gave the videotape to Karl Aaronian, Playmates' Vice President of Marketing, and had no further involvement with BATTLETECH or the development of the EXO-SQUAD toys. (Dailey Decl.; Aaronian Tr. 1822–24).

8. A dispute exists between the parties as to whether Allen left any BATTLETECH toy prototypes during his visit with Ms. Dailey. Allen claims he presented and left toy prototypes, but Dailey does not recall any prototypes. (Allen Tr. 192:4–13, 193:1–17;

---

ord, the Court expressly finds that numerous key design differences outweigh any general similarities in the designs of the Clan Elemental, the Phaeton and the J.T. Marsh designs and indicate that the latter designs were not copied from the Clan Elemental. The Phaeton and J.T. Marsh designs are substantially dissimilar from the Clan Elemental. (Macek Decl.; Siembieda Decl.; Appendix G).

Dailey Tr. 201:18–200). Ms. Dailey's testimony is corroborated by her notes, which make no reference to any BATTLETECH prototypes (JX. 58).

9. Ms. Dailey told Allen that she would not be able "to get back to" Allen on the BATTLETECH toy concept until after the 1992 Toy Fair. (Allen Tr. 108). The Toy Fair is an annual exposition at which toy manufacturers show their planned line for the upcoming year to industry representatives. After the February 1992 Toy Fair, Sallis again focused his attention on the development of a robotic toy line. Aaronian and Sallis watched the BATTLETECH center promotional video (PX. 281, 18J; Sallis Tr. 1648–49). This video does not: (1) describe the BATTLETECH story; (2) depict the Mad Cat design; or (3) depict any BATTLETECH toy concepts. (PX. 281; Aaronian Tr. 1819–26).

10. On March 3, 1992, March 7, 1992, and again on March 9, 1992, Karl Aaronian called Bob Allen to request more information on BATTLETECH and more BATTLETECH product. (PX 282, 293; Allen Decl.).

11. On March 23, 1992, Allen received a call directly from Richard Sallis, President of Playmates, who was interested in receiving additional information on BATTLETECH as soon as possible. (PX 282; Allen Decl.).

12. On April 2, 1992, Sallis met with Universal Cartoon Studios to discuss the creation of a space based animated series with a "harder edge"—a battle theme with a "heavy emphasis on robots." (PX 730; Segal Decl.).

13. On April 2, 1992, in response to Playmates' several requests, Allen sent Sallis a copy of The BATTLETECH Compendium, a comprehensive compilation of rules, battle demonstrations and MECH construction, Technical Readout: 2750, a catalogue of illustrations, statistics and other vital information about the BATTLEMECHs and other promotional materials. (PX 283, 284; PXGE 18–J; Allen Decl.; Sallis Tr. 1498–99).

14. On April 7, 1992, Playmates hired Russ Edmisson, a freelance designer, to prepare drawings and prototypes for Playmates. Mr. Edmisson signed a standard Playmates confidentiality form that was captioned "RE: BATTLETECH." (PX 458–59; Edmisson Tr. 1736–39; Aaronian Tr. 1826–29; Sallis Tr. 1502).

15. Aaronian told Edmisson that Playmates had a very high priority project involving the construction of a large robot with tons of firepower. Aaronian showed Edmisson some material torn out of magazines and instructed Edmisson to build a prototype robot as soon as possible. (Edmisson Tr. 1739–40; Aaronian Tr. 1829–33).

16. Edmisson, in turn, hired Sonos Models, Inc. ("Sonos") a model making company, to build the prototype Playmates robot pursuant to Edmisson's direction and with his assistance. Edmisson purchased a "Robocop" ED–209 Model Kit, for approximately $300.00, and various Japanese robotic model Kits and worked with Carl TenBrink, the President of Sonos, to make the generic robot model from miscellaneous plastic parts. Aaronian had no direct contact with TenBrink concerning the robot model. (Edmisson Tr. 1746–49; TenBrink Tr. 2026–57).

17. The prototype Sonos Models robot was delivered to Playmates approximately one week later, on or about April 21, 1991. (PX 811; Edmisson Tr. 1742–52; TenBrink Tr. 2035–36).

18. In late April or early May, 1992, Sallis met again with Segal and Ward at Universal. Sallis showed a film clip of the large walking robotic vehicles from the Star Wars movie "Empire Strikes Back" (Troop Transporters) as an example of the kind of robotic features that Sallis contemplated for a new Playmates toy line. (Sallis Tr. 1593–94; Segal Tr. 1705–06). The Universal representatives told Sallis that they had substantial previous experience with robotic works, including past work on Star Wars, GOBOTS and TRANSFORMERS, and already had ideas for a television program that would feature characters and robotic vehicles that could serve as the basis for a toy line. (Sallis Tr. 1594; Segal Decl.).

19. On May 5, 1992, Playmates separately retained Frank Asano, a model builder with Sente, to build a prototype robot like the BATTLETECH Mad Cat pictured on the cover of The BATTLETECH Center bro-

chure. (Asano Decl.). Richard Sallis had previously provided the brochure to Asano during a trip to Japan. (PX 432; Sallis Tr. 1518–22; Aaronian Tr. 1837–44). The purpose of having the prototype built was to allow Playmates to determine, based on a three-dimensional form, whether the BATTLETECH design would provide a suitable basis for a toy line. This is a standard procedure in the toy industry. (Sallis Tr. 1590–92).

20. Asano did not build his prototype on the basis of the BATTLETECH design because he claimed that the BATTLETECH design appeared to be copies from prior Japanese robots. (Sallis Tr. 1562; Asano Decl.). The Asano prototype did not resemble the BATTLETECH design and was placed in a closet at Playmates and never used for any purpose. (PX 810; Asano Decl.; Asano Tr. 2015–19; Sallis Tr. 1591–92).

21. Playmates specifically instructed Asano to include "very small figures [to] ride in the 'cockpit of the robot'" and "'blow-off' battle armor that falls away when hit by spring loaded missiles," features identical to the BATTLETECH prototypes presented by Allen. (PX 432, 811; Sallis Tr. 1519–21; Aaronian Tr. 1844–45). ·

22. On May 11, 1992, Sallis called Allen to discuss whether there was a possibility of putting together an animated cartoon show about BATTLETECH because Playmates' preference was to produce its new robotic action figure toy line with a corresponding television series. (Sallis Tr. 1592–93). Many successful toy lines, such as the Ninja Turtles and Power Rangers have been promoted in this fashion. (Johnson Tr. 2219). Sallis also discussed potential royalties and budgets with Allen. (PX 293; Allen Decl.; Sallis Tr. 1523–24).

23. On May 15, 1992, Allen called Sallis to discuss BATTLETECH. During that call, Sallis specifically asked Allen what would prevent another toy company from doing a line similar to BATTLETECH without it being BATTLETECH. Allen warned Sallis that no one could copy BATTLETECH. Sallis remembered that he talked to Allen about the kind of financial arrangements FASA was looking for and the potential tele-

vision show. (PX 282; Allen Decl.; Sallis Tr. 1592–93). Sallis also recalled asking Allen some "hard questions" about prior toy robots in the market place and exactly what Playmates was buying. (Sallis Tr. 1595–96, 1677). Sallis testified he was concerned, at this point, that FASA was trying to sell previously existing properties, like Robotech, that it did not own. (Sallis Tr. 1677–78).

24. Four days later, on May 19, 1992, Sallis met with Universal to review EXOFORCE, a concept designed primarily in response to Sallis' request for a "harder edge" robot themed property.

25. Playmates took the robot prototype created by Edmisson and Sonos Models (PX 811) to at least one, if not two, meetings at Universal and indicated that this prototype was what Playmates was looking for in a robotic property. (Sallis Tr. 1594, 1690; Segal Tr. 1703; Ward Dep.; Meunigot Dep.).

26. In May, 1992, Sallis met with representatives from the Japanese company, Takara, to continue ongoing discussions about a possible robotic toy line. Sallis showed the Takara representative, Tario Watabiki, a poster depicting various BATTLETECH robot designs. Mr. Watabiki generally indicated that Takara would not be interested because various BATTLETECH designs appeared to be the same as, or copied from, robot designs previously marketed in Japan. (Sallis Tr. 1598–1600). After his meeting with Watabiki, Sallis instructed Aaronian to tell Allen that Playmates was not interested in BATTLETECH. (Sallis Tr. 1600).

27. On May 27, 1992, Karl Aaronian informed Allen, during a phone conversation, that Playmates was not interested in a BATTLETECH license. (PX 282; Allen Decl.; Aaronian Tr. 1848).

28. On May 28, 1992, Allen called Aaronian and specifically requested that Playmates return all BATTLETECH material. (Allen Decl.).

29. On June 3, 1992, Aaronian wrote a letter to Allen, confirming Playmates' lack of interest in the BATTLETECH properties. (PX 294; Aaronian Tr. 1848).

30. On June 3, 1992, in a separate envelope, Playmates returned only the video tape and presentation folder submitted by Allen, but retained the poster depicting at least 48 BATTLEMECHs, the comprehensive *BATTLETECH Compendium* and the *Technical Readout: 2750* containing detailed MECH designs. (PX 285–92, 295; Allen Decl.).

31. In June, Playmates shifted gears and started to focus on Segal's EXOFORCE idea, which developed into EXO–SQUAD. On June 15, 1992, Edmisson signed new non-disclosure and work-for-hire forms prepared by Playmates bearing the caption "Re: EXOFORCE." (PX 460–61; Edmisson Tr. 1752). At that point Edmisson believed he was starting a new project. (Tr. 1752). Thereafter, Playmates hired at least four independent contractors to develop designs for its E–Frame toys. These individuals communicated with Karl Aaronian from Playmates who gave them instructions and directions on the desired appearance and features of the toy designs. (PX 48, 49, 627, 628, 641, 642, 697, 698; Geiman Dep.; S. Lee Dep.; Mosqueda Dep.; and Aaronian Tr. 1850–57).

32. It was not uncommon for Karl Aaronian to assign one design to one designer for some development and then take that designer's work to a second designer for revision and additional development. (Geiman Dep.; S. Lee Dep.; Mosqueda Dep.; Aaronian Tr. 1857–63).

33. Throughout this period, Karl Aaronian had access to many robot-related materials. However, FASA has not proved that he had specific access to the BATTLETECH materials Playmates had retained from Allen. (PX 283, 284, 294). Prior to initiation of this lawsuit, neither Edmisson nor TenBrink had ever seen BATTLETECH materials, designs or images. (Edmisson Tr. 1737–76; TenBrink Tr. 2029–36).

34. In November and December 1992, Playmates instructed Russ Edmisson to build a second prototype robot. Edmisson again hired Sonos Models and, under Edmisson's direction and with his assistance, Sonos Models constructed a second prototype E–Frame robot which Playmates displayed to the trade, the press, and others at the 1993 Toy Fair as part of the special, large display constructed by Playmates for the EXO–SQUAD toy line. (PX 812; Sallis Tr. 1541; Edmisson Tr. 1759–62; Aaronian Tr. 1879).

35. The EXO–SQUAD toy line was introduced to the trade at the February, 1993 Toy Fair in New York. An EXO–SQUAD animated television series premiered on national television in September, 1993. Universal Cartoon Studios owns copyright and trademark rights to the EXO–SQUAD toy line and television program. (Sallis Tr. 1632–36).

36. The second prototype robot built by Edmisson and Sonos Models was featured in the 1993 Playmates Toy Catalogue as the Heavy Attack E–Frame, even though Playmates was not sure it intended to mass produce this toy because of cost concerns. (JX 2; Sallis Tr. 1541; Aaronian Tr. 1886–89). The catalogue was distributed to members of the retailers trade attending the Toy Fair and other retail customers of Playmates. (JX 2; Sallis Tr. 1541; Aaronian Tr. 1879–84).

37. Playmates' 1993 catalog featured eleven E–Frames: Command E–Frame (with Phaeton action figure); Stealth E–Frame (with Typhon action figure); Amphibious Assault E–Frame (with Shiva action figure); Communications Intelligence E–Frame (with DeLeon action figure); Aerial Attack E–Frame (with Mace Corbitt action figure); Rapid Assault E–Frame (with Marsala action figure); Ground Assault E–Frame (with Draconis action figure); Police Enforcer E–Frame (with Napier action figure); Troop Transport E–Frame (with Livanus action figure); Field Repair E–Frame (with Maggie action figure); and, the EXO–SQUAD Heavy Attack E–Frame. (JX 2). Ultimately, the Heavy Attack E–Frame was not produced or sold.

38. Photos of the Heavy Attack E–Frame featured at the 1993 Toy Fair were published in various magazines, including *Previews* (Diamond Comic Distributors) (PX 838); *Action Figure Digest* (Tomart) (PX 840); and *Action Figure News and Toy Review* (PX 839).

39. Playmates has advertised its EXO–SQUAD toy line in some of the same publica-

tions in which FASA advertises BATTLE-TECH product. (PX 795).

40. Playmates received some orders from toy customers for the Heavy Attack E-Frame. (PX 794; Sallis Tr. 1540).

41. Playmates established that the EXO-SQUAD Heavy Attack E-Frame was independently created by Edmisson and Ten-Brink without knowledge of the BATTLE-TECH Mad Cat design and was not copied or derived from the Mad Cat design. (Edmisson Tr. 1737–76; TenBrink Tr. 2029–36).

### B. *FASA's Efforts To License Its BATTLETECH Designs To Tyco*

42. Following Playmates' rejection of the opportunity to purchase a BATTLETECH license, FASA renewed its discussions with Tyco Toys, Inc., which had also viewed a presentation by Robert Allen regarding BATTLETECH in January of 1992. (Allen Decl.; Block Tr. 1221–25).

43. Tyco took an option on BATTLE-TECH in July or August of 1992 and began developing designs for a BATTLETECH toy line. (Allen Decl.; Block Tr. 1227; Brown Tr. 1399).

44. In the period from August of 1992 through November of 1992, Tyco began developing BATTLETECH designs and evaluating a potential BATTLETECH toy line. (PX 353; Brown Tr. 1400–05; Fukutaki Tr. 1315–27; Block Tr. 1230–33).

45. In November of 1992, Tyco renewed its option on a BATTLETECH toy line and continued its evaluation. (Brown Tr. 1405–11; Fukutaki Tr. 1328; Block Tr. 1230–31).

46. After examining the results of viability testing on BATTLETECH toys, Tyco informed FASA that it would proceed to finalize the terms of a license agreement. (PX 336; Brown Tr. 1411; Fukutaki Tr. 1333; Block Tr. 1230–31).

47. FASA and Tyco negotiated the terms of a license agreement during January of 1993. FASA and Tyco had planned on entering into a BATTLETECH license agreement at the 1993 Toy Fair. (Brown Tr. 1412–17; M. Weisman).

48. After Tyco representatives saw Playmates' EXO–SQUAD toy line at Toy Fair, Tyco delayed execution of the planned license agreement but ultimately decided to proceed with a limited BATTLETECH toy line. (PX 338, 386; M. Weisman; Brown Tr. 1416–19; Block Tr. 1233–36; Fukutaki Tr. 1340–54).

49. Although Tyco subsequently agreed to enter into a license with FASA, the release of the toy line was delayed for one year and the proposed toys were redesigned due to the EXO–SQUAD toy line. (Brown Tr. 1419–37; Fukutaki Tr. 1354–58).

50. Tyco's decision to delay its release of its BATTLETECH toy line was essentially a business decision which was based on many factors, including Playmates release of the EXO–SQUAD toy line and BATTLETECH's lack of an animated television series. (Fukutaki Tr. 1347).

### C. *FASA's Alleged Confusion Evidence*

51. At trial, FASA admitted the relevant market for determining FASA's secondary meaning is the specific role-playing game market, not the general toy market. (Tr. 1205).

52. At trial, FASA failed to submit any expert study which attempted to study the likelihood of confusion among relevant consumers. (Johnson Tr. 2218).

53. Instead, despite FASA's international BATTLETECH Market, FASA only offered three witnesses at trial in an attempt to establish actual confusion. The collective testimony of these three witnesses was extremely weak and did not establish even a likelihood of confusion.

54. David Crowe, a free lance adventure writer and employee of a comic store in Scottsdale, Arizona, saw the Playmates EXO–SQUAD toys advertisement in *Previews* (Diamond Comic Distributors) and *Action Figure Digest* (Tomart) in April of 1993. (PX 838; Crowe Tr. 1914–17). Crowe described himself as a long time fan, owner and devoted player of BATTLETECH role-playing games. (Crowe Tr. 1915). He noticed the Heavy Attack E–Frame first and felt it was a "direct swipe" of BATTLETECH's Mad Cat. (Crowe Tr. 1917). His initial

response was that someone had licensed BATTLETECH. However, when he looked closer he saw that it was not BATTLETECH but EXO–SQUAD. (Crowe Tr. 1917). He then wrote a letter to FASA which read: "The first time I saw the picture [of the Heavy Attack E–Frame], I thought it was a photo of the recent BATTLETECH Mad Cat model kit.... Upon learning otherwise, I thought it was a blatant case of plagiarism." (PX 391).

55. David Vasconcellas, a forklift driver with prior military service who became a serious BATTLETECH game player, was changing television channels in the late summer of 1994 when he noticed an animated program in progress which he thought was BATTLETECH for several reasons: He thought he recognized a Vulture MECH; the leader of the warriors was General Davion, whom he thought was leader of the House of Davion in BATTLETECH; the warriors were going to attack a Clan base, which he thought meant the House of Davion was attacking a Clan base in BATTLETECH; he saw an emblem that looked like a BATTLE-TECH Clan emblem; and, one of the vehicles used by the Clan warriors looked like a Clan Elemental suit. (Vasconcellas Tr. 1984–88). During a commercial break when the program was identified as EXO–SQUAD, Vasconcellas realized it was not a BATTLE-TECH program. Subsequently, his wife purchased an EXO–SQUAD J.T. Marsh toy for their four year old son. (DX 142; Vasconcellas Tr. 1995). Mr. Vasconcellas did indicate that his four-year old son confused the EXO–SQUAD J.T. Marsh Toy with a BATTLETECH Mech. (Vasconcellas Tr. 2001).

56. John Skerchock, a Pennsylvania State Police Officer and part-time creative writer, first saw the EXO–SQUAD toy advertisement in *Action Figure Digest* in 1993. (Tr. 1941). Mr. Skerchock described himself as an avid fantasy role-playing game player. (Skerchock Tr. 1943–45). Mr. Skerchock became familiar with BATTLETECH during his part-time employment at a specialty book shop. Although he described himself as an avid BATTLETECH fan, he was only familiar with about six of BATTLETECH's nu-

merous MECH designs. (Skerchock Tr. 1942, 1972). Initially, he thought FASA had finally decided to come out with a modified toy line that involved little action figures. (Skerchock Tr. 1958). Yet, he still was not sure if they were related to BATTLETECH. When he saw the EXO–SQUAD toys at Walmart he realized they were not from BATT-LETECH. (Skerchock Tr. 1956). Nevertheless, he wrote to FASA, "If EXO–SQUAD isn't BATTLETECH, it's damn close." (PX 390; Skerchock Tr. 1962–63).

Mr. Skerchock never heard any game-playing fans complain about being confused between BATTLETECH and EXO–SQUAD products. (Skerchock Tr. 1965–66). Instead, customers merely noted a general similarity between BATTLETECH and the EXO–SQUAD toys and indicated their disappointment that BATTLETECH had not come out with a toy line. (Skerchock Tr. 1951–52).

Mr. Skerchock acknowledged that the prior Robotech model kits were similar to BATTLETECH. (Skerchock Tr. 1975–76). He also acknowledged that the exposed body parts of the EXO–SQUAD characters were fundamentally inconsistent with the BATT-LETECH gaming scenario. (Skerchock Tr. 1960).

### D. *Playmates' Survey Evidence Established A Lack of Any Trade Dress Confusion*

57. During the trial, Playmates presented the expert testimony of Edward Epstein, the President of a marketing research firm. (Epstein Decl.). Epstein's survey, which was conducted in an appropriate methodological fashion, established that consumers of action toys and action figures (both children and their parents) are very unlikely to confuse EXO–SQUAD with BATTLETECH. The study found no probative evidence of any consumer confusion—98.6% of the persons interviewed after seeing display packages of both products, did not confuse the trade dress of EXO–SQUAD with that of BATT-LETECH. (Epstein Decl.; DX 463–64; Epstein Tr. 2188–2200).

### E. *Playmates' Heavy Attack E–Frame Prototype Is Not Substantially Similar To FASA's Mad Cat Design*

58. Mr. Edmisson, the independent designer hired by Mr. Aaronian to create the original Heavy Attack E–Frame prototype, was shown some colored photographs of actual Japanese model kits by Mr. Aaronian prior to the commencement of work on the prototype. Mr. Edmisson knows that they were not colored photographs of the Mad Cat. (Edmisson Tr. 1739:13–1742:6).

59. Mr. Edmisson contacted Sonos Models to create the Heavy Attack E–Frame prototype. (Edmisson Tr. 1742:7–19).

60. When building the prototype (PX 811), Mr. TenBrink of Sonos Models used no books or references and was unaware of any drawings or designs he was to use. (TenBrink Tr. 2035:20–2036:19).

61. The prototype model had to be built in five or six days. (Edmisson Tr. 1742:7–25).

62. During the time that Mr. TenBrink worked on either the prototype or the model displayed at Toy Fair (PX 812), he never saw any material relating to BATTLETECH or Mad Cat images. (TenBrink Tr. 2057:6–14). Mr. Edmisson did not see any BATTLE-TECH images during the time he worked on either the prototype or the Toy Fair model. (Edmisson Tr. 1750:1–8, 1752:9–14, 1760:15–1761:18).

63. There is no showing of any contact between Mr. Aaronian and either Mr. Edmisson or Mr. TenBrink from the time the assignment was given to Mr. Edmisson until after delivery of the prototype.

64. Unlike the Mad Cat design, one arm of the Heavy Attack E–Frame prototype has a rotating cannon or Gatling gun that is very highly detailed that goes up into a much thicker arm than the arm on the Mad Cat design. (Appendix B; Edmisson Tr. 1750:12–18; Crowe Tr. 1927:22–1928:4).

65. Unlike the Mad Cat design, the top of the Heavy Attack E–Frame prototype forms a straight line without a dip in the center. (Edmisson Tr. 1750:19–22).

66. Unlike the Mad Cat, the Heavy Attack E–Frame prototype has multiple rounded areas on the cockpit. (Crowe Tr. 1927:17–21).

67. The nose of the Heavy Attack E–Frame prototype is shorter than the nose of the Mad Cat. (Crowe Tr. 1927:13–16).

68. Unlike the Mad Cat design, the upper part of the Heavy Attack E–Frame prototype is very solid and very heavy, with much detail running across the center section. (Edmisson Tr. 1750:20–22).

69. Unlike the Mad Cat design, the Heavy Attack E–Frame has a thicker transition of the torso down into the base with weapons hanging below the bottom center section. (Edmisson Tr. 1750:23–24).

70. The legs of the Mad Cat design are significantly taller, thinner and scrawnier than the legs of the Heavy Attack E–Frame prototype. (TenBrink Tr. 2036:20–24).

71. Unlike the Mad Cat design, the legs of the Heavy Attack E–Frame have swing-out shields on the sides with a tremendous amount of detail imposed on them. (Edmisson Tr. 1750:24–1751:2).

72. Unlike the Heavy Attack E–Frame prototype, the Mad Cat design is very sleek, very thin—including the arms and legs. The Mad Cat design is much more fragile-looking than the Heavy Attack E–Frame prototype. (Edmisson Tr. 1751:3–5).

73. The Heavy Attack E–Frame prototypes draw from the following sources: the shoulder joint, leg assembly, gun and feet are from ROBOCOP's ED–209 (DX 384); the shoulder-mounted missile launcher is similar to many earlier designs, including the MA-CROSS Tomahawk (DX 479 and DX 135 at 7, 18) and the DOUGRAM Soltic "Roundfacer H8" (DX 478 and DX 135 at 14, 16) (Macek Decl.).

74. Even Mr. Crowe, FASA's own confusion witness, acknowledged that there were sufficient differences between the Heavy Attack E–Frame for him to distinguish it from the Mad Cat. (Crowe Tr. 1937).

75. Numerous key design differences outweigh any general similarities in the designs of the Mad Cat and the Heavy Attack E–

Frame and indicate that one was not copied from the other. The protectible aspects of the Mad Cat and Heavy Attack E–Frame designs are substantially dissimilar. (PX 799F; Appendix B).

### F. Playmates' Marsala Light Attack E–Frame Toy Is Not Substantially Similar to FASA's Black Hawk Design:

76. FASA's purported confusion witness Mr. Skerchock could not identify any similarity between Marsala and any specific BATTLETECH product: just "roundness," "aggressiveness" and "extra battle features." (Skerchock Tr. 1967:6–1968:3).

77. The Marsala Light Attack E–Frame does not follow at all the geometric, straightline look of Black Hawk. (Schaub Decl.; Siembieda Decl.). Unlike Black Hawk, the Marsala Light Attack E–Frame has an animalistic, bird-like appearance, compared to Black Hawk's mechanical, squat appearance. (Schaub Decl.; Schaub Tr. 2114:20–2115:4).

78. The Marsala Light Attack E–Frame's bird-like appearance contrasts with Black Hawk's design details such as its over-sized fists with prominent, individually detailed fingers. (Schaub Decl.; Schaub Tr. 2115:2–7; Sallis Tr. 1615:11–13).

79. The Black Hawk appears to have a mass four to five times that of the Marsala Light Attack E–Frame. (Schaub Tr. 2115:8–13).

80. The Black Hawk has "very heavy-equipment-looking feet ... wide stancing, wide outriggers on the side" whereas the Marsala Light Attack E–Frame has "little bird feet" with wheels on the bottom to make its movement more like that of a chicken. (Schaub Tr. 2115:24–20; Siembieda Decl.; Sallis Tr. 1616:4–6).

81. Unlike the Black Hawk design, the Marsala Light Attack E–Frame does not have arms: in their stead it has a flexible, mechanical extension for a gun. (Schaub Tr. 2115:21–25).

82. The overall form of the Marsala Light Attack E–Frame differs from that of the Black Hawk in that the head is above the center of the E–Frame, like a bird walking, whereas the Black Hawk is low-slung, with its head below the center-line of the body and shoulders like a crouched-down machine. (Schaub Tr. 2116:1–20).

83. The relative size and proportions of the cockpits of the Marsala Light Attack E–Frame and the Black Hawk are altogether different. (Schaub Tr. 2115:12–20). The cockpit of the Marsala toy is wide open so the child can see the character inside, but the Black Hawk cockpit appears to be closed with little ability to see inside. (Sallis Tr. 1616:6–10).

84. Unlike the flat platform behind the cockpit of the Black Hawk, the Marsala Light Attack E–Frame has a gun turret and a helicopter-like attachment that flies out of it. (Schaub Tr. 2117:7–14).

85. The Marsala toy has shoulder firing missiles and the Black Hawk design does not. (Sallis Tr. 1615:16–17). A lot of guns or armaments are on the sides of the Marsala toy but not on the sides of the Black Hawk design. (Sallis Tr. 1615).

86. The Marsala toy can fly and go through space, whereas Black Hawk merely has jump jets that permit it to jump like a kangaroo. (Sallis Tr. 1616:10–12).

87. Numerous key design differences outweigh any general similarities in design and indicate that the Marsala toy was not copied from the Black Hawk design. (Schaub Decl.). The protectible aspects of the Marsala and Black Hawk designs are substantially dissimilar. (JX 21; PX 799B; Appendix C).

### G. Playmates' Livanus Light Attack E–Frame Is Not Substantially Similar To FASA's Black Hawk Design:

88. The rounded "fat bird" appearance of the Livanus Light Attack E–Frame design (JX 38) contrasts with the Black Hawk's very straight, geometric lines and machine-like appearance. (Schaub Decl.; Schaub Tr. 2117:15–22; Siembieda Decl.; Sallis Tr. 1616:14–1617:2).

89. The stance and proportions of the two designs are different: Black Hawk's body is

raised high whereas the Livanus toy comes down quite far. (Sallis Tr. 1620:17–21).

90. The Livanus Light Attack E–Frame has a large, clear canopy that allows two pilots to be in full view, whereas the Black Hawk has a smaller pilot cockpit. (Schaub Tr. 2117:25–2118:3; Sallis Tr. 1616:6–10, 1620:9–12).

91. The Livanus Light Attack E–Frame has a curved upper cockpit area, whereas the Black Hawk design is flat across the shoulders. (Schaub Tr. 2118:4–11; Sallis Tr. 1619:21–25).

92. Unlike the Livanus Light Attack E–Frame, the Black Hawk design has definite robot characteristics. (Schaub Decl.).

93. Unlike the Livanus Light Attack E–Frame, the Black Hawk design has individual fingers and facial features. (Schaub Decl.).

94. The Livanus Light Attack E–Frame has its legs attached about mid-body, whereas on the Black Hawk they are attached at the very top of the body. (Schaub Tr. 2118:12–18).

95. The foot arrangement of the two is very different: Black Hawk has what appears to be a toe coming forward and a toe on the right and left side of each foot; Livanus has a large center toe with a smaller toe on each side of the center toe. (Schaub Tr. 2117:23–2; Sallis Tr. 1620:2–7).

96. Numerous key design differences distinguish the Livanus Light Attack E–Frame design from the Black Hawk design. The Livanus Light Attack E–Frame design was not copied from the Black Hawk design. (Schaub Decl.; Schaub Tr. 2119:9–12). The protectible aspects of the designs of the Livanus Light Attack E–Frame and the Black Hawk are substantially dissimilar. (JX 38; PX 799B; Appendix C).

**H. Playmates' Livanus Light Attack E–Frame Is Not Substantially Similar To FASA's Bushwacker Design**

97. The Livanus toy is much wider in body proportions than is Bushwacker. (Sallis Tr. 1619:4–6).

98. The Livanus E–Frame has a clear canopy so the child can see the characters inside. (Sallis Tr. 1618:6–9).

99. The Livanus toy is clearly designed to hold two people. (Sallis Tr. 1618:6–7).

100. Unlike the Livanus toy, the Bushwacker has a square rocket pod in the upper right-hand corner that appears to hold six rockets. (Sallis Tr. 1618:13–15).

101. The design of the guns and armament is quite different, including the way the arms are hinged and come down and the different types of guns. (Sallis Tr. 1618:16–17, 1619:13–18).

102. The Livanus toy has multiple air intake valves on shoulders that are not present on the Bushwacker. (Sallis Tr. 1618:17–18).

103. Livanus has a large center toe and two smaller toes on either side; Bushwacker appears to have either three or four toes all the same size in a symmetrical pattern. (Sallis Tr. 1619:7–12).

104. Numerous key design differences distinguish the Bushwacker design from the Livanus Light Attack E–Frame design. The Livanus Light Attack E–Frame design was not copied from the Bushwacker design. The protectible aspects of the designs of the Livanus Light Attack E–Frame and the Bushwacker are substantially dissimilar. (JX 38; DGX 805; Appendixes C & H).

**I. Playmates' General Shiva Light Attack E–Frame Is Not Substantially Similar To The King Crab Design:**

105. Overall, Shiva differs markedly from the King Crab design because of its massive structure. (Schaub Decl.).

106. Like the rest of the EXO–SQUAD line of toys, the interaction of the pilots and the General Shiva Light Attack E–Frame is central to the toy design, whereas in FASA's King Crab design, the interaction with the soldiers is left out entirely or is at least very different from the EXO–SQUAD toys. (Schaub Tr. 2120:13–19).

107. The General Shiva Light Attack E–Frame has separate head and body structures, whereas the King Crab design has a

single-body combination like a real crab. (Schaub Tr. 2119:13–2120:1).

108. The two designs do not share similar segmentation of the body because the radial profile of the General Shiva Light Attack E–Frame gives it a different look. (Schaub Tr. 2121:11–24).

109. Unlike the design of the King Crab, the cockpit of the General Shiva Light Attack E–Frame is a clear glass cockpit that permits the child to see inside.

110. Shiva has a rotating tank-like turret at the waist area. (Schaub Decl.).

111. King Crab has the look of a crab creature with slim legs, small feet and no real weaponry. (Schaub Decl.). The General Shiva's lower legs, feet and torso are very massive in design and much different. (Schaub Decl.).

112. The General Shiva Light Attack E–Frame has huge legs with angled plates that would telescope in and out and a big, wide stance for a foot, whereas the King Crab has very cylindrical crab-like legs with rather small feet. (Schaub Tr. 2120:23–2121:4).

113. The feet of the General Shiva E–Frame have four points while those of the King Crab have what appears to be a pad with a hook on the back or a spur. (Sallis Tr. 1612:11–19).

114. Unlike the King Crab design, the General Shiva Light Attack E–Frame has a large, realistic, functional claw with teeth on the inside. (Schaub Tr. 2120:2–8).

115. There is a light module on the front of the General Shiva E–Frame toy and another on the side, which are not present on the King Crab design. (Sallis Tr. 1612:9–11).

116. The weaponry of the two is not similar: Shiva has multiple guns not present on the King Crab, which shoot from many different angles. (Sallis Tr. 1612:4; Schaub Decl.).

117. The General Shiva toy has large knobs on the sides, which are not present on the King Crab design. (Sallis Tr. 1612:22–23).

118. Numerous key design differences distinguish Shiva from King Crab and indi-

cate one was not copied from the other. (Schaub Decl; Schaub Tr. 2121:25–2122:2; Rovin Decl.). The protectible aspects of the Shiva and King Crab designs are substantially dissimilar. (PX 799E; Appendix A).

### J. *Playmates' Alec DeLeon E–Frame Is Not Substantially Similar To FASA's Koshi Design:*

119. The body shape and styling of the Alec DeLeon design (JX 19) is entirely different than BATTLETECH's Koshi design. (Siembieda Decl.).

120. The Alec DeLeon E–Frame toy has a plexiglass front that permits much of the character to be seen whereas no character can be seen in the Koshi design. (Sallis Tr. 1621:6–11).

121. Koshi's shoulders are different from those of the Alec DeLeon E–Frame. (Siembieda Decl.).

122. Koshi's legs do not look like those of the Alec DeLeon E–Frame. (Siembieda Decl.).

123. The Koshi and Alec DeLeon designs have differently designed arms. (Siembieda Decl.).

124. Koshi has clearly visible hands; the Alec DeLeon toy does not have hands, only weapon appendages. (Sallis Tr. 1621:19–22).

125. Koshi is supposed to be a giant robot over forty feet tall; the E–Frame is supposed to be only eight to ten feet tall. (Siembieda Decl.).

126. Koshi is supposed to weigh 25 tons, much more than a single-man E–Frame. (Sallis Tr. 1621:12–15).

127. Koshi has only kangaroo-like jump-jet capabilities whereas the E–Frame can fly into space. (Sallis Tr. 1622:5–7).

128. The Alec DeLeon toy is the communications E–Frame, so it has a radar dome on top and other communications gear, none of which is present in Koshi. (Sallis Tr. 1621:23–25).

129. Numerous key design differences distinguish the Koshi design from the Alec DeLeon design and indicate one was not copied from the other. The protectible as-

pects of the designs of the Koshi and the Alec DeLeon E–Frame are substantially dissimilar. (PGX 7B; JX 19; Appendix F).

### K. *Playmates' Alec DeLeon E–Frame Is Not Substantially Similar To FASA's Daishi Design:*

130. FASA's purported confusion witness Mr. Crowe testified that the Alec DeLeon E–Frame "is not strongly reminiscent of any FASA design." (Crowe Tr. 1931:24–1932:2).

131. FASA's purported confusion witness Mr. Skerchock does not know any BATTLE-TECH Mech that he finds to be the same as the Alec DeLeon E–Frame. (Skerchock Tr. 1972:23–1973:6).

132. The total design concept is different: Daishi is supposed to weigh 100 tons whereas the E–Frame would weigh only one or two tons. (Sallis Tr. 1622:11–14).

133. Daishi is supposed to be a huge robot vehicle over forty feet tall; the E–Frame is supposed to be only eight to ten feet tall. (Siembieda Decl.).

134. Unlike all the E–Frames, the pilot inside the Daishi design is not visible. (Sallis Tr. 1622:17–18).

135. Unlike the Alec DeLeon E–Frame, Daishi is very blocky/boxy, angular and squat. (Siembieda Decl.).

136. The legs are different: Daishi has thick legs and bulbous knees, and the E–Frame has much greater detail in the legs. (Siembieda Decl.; Sallis Tr. 1622:18–21).

137. Daishi also differs from the Alec DeLeon E–Frame in that it has a pushed-forward body and housing. (Siembieda Decl.).

138. The body shape, shoulders, feet, legs, arms and styling of Daishi have nothing in common with the Alec DeLeon E–Frame. (Siembieda Decl.).

139. Daishi has oddly angled feet that are shaped differently from those of the Alec DeLeon E–Frame; Daishi has an appendage going out on either side to stabilize the foot; whereas the ExoFrame has more of a standard, webbed foot. (Siembieda Decl.; Sallis Tr. 1623:4–7).

140. The weaponry of the Daishi and Alec DeLeon E–Frame is quite different: the Alec DeLeon E–Frame toy has a large gun on both sides; Daishi has five smaller guns on either side. (Sallis Tr. 1621:16–1623:3).

141. The Daishi design has a box for rockets on the top; the E–Frame does not. (Sallis Tr. 1622:16–17).

142. The only similarity between Daishi and the Alec DeLeon E–Frame is that both have weapon arms and fire missiles, but those elements have a completely different "look" in the two works. (Siembieda Decl.).

143. Numerous key design differences distinguish the Daishi and Alec DeLeon E–Frame designs and indicate one was not copied from the other. The protectible aspects of the designs of the Daishi and Alec DeLeon E–Frame are substantially dissimilar. (JX 19; PGX 7B; Appendixes D & F).

### L. *Playmates' Maggie Weston Repair Light Attack E–Frame Is Not Substantially Similar To FASA's Dasher Design:*

144. There is very little similarity at all between the Maggie Weston Repair Light Attack E–Frame ("Maggie") (DX 747) and the Dasher design. The basic body styling is completely different. (Siembieda Decl.; Sallis Tr. 1612:9–12).

145. The design concept of the two is entirely different because Maggie was designed to be a rescuer or a tow unit to rescue other E–Frames. (Sallis Tr. 1613:16–17).

146. The feet and legs of the two differ. (Siembieda Decl.). Unlike the BATTLE-TECH MECHs, and unlike Dasher in particular, Maggie's feet are really tank treads instead of the MECH's standard feet. (Skerchock Tr. 1974:1–3; Sallis Tr. 1613:14–17).

147. The hands are different: Dasher has up-raised human hands with four distinct fingers and a thumb whereas Maggie has claws with no fingers. (Siembieda Decl.).

148. Dasher has a head but Maggie does not. (Siembieda Decl.).

149. The weapons systems are completely different. (Siembieda Decl.).

150. Unlike the BATTLETECH MECHs, Maggie has a prominent rake on the back. (Skerchock Tr. 1973:19–25).

151. The Dasher design has no jump jets, whereas Maggie's E–Frame can travel through air and space. (Sallis Tr. 1613:19–25).

152. Numerous key design differences outweigh any general similarities in the designs of Dasher and Maggie and indicate that one was not copied from the other. The protectible aspects of the Dasher and Maggie designs are substantially dissimilar. (PX 799A; Appendix E).

**M. The Heavy Attack E–Frame Prototypes Of EXO–SQUAD Toys Were Independently Created**

153. The creators of the Heavy Attack E–Frame prototypes had access to and were familiar with Japanese mecha designs; some pieces from mecha models were used in creating the prototype of the Heavy Attack E–Frame. (Edmisson Tr. 1735:7–1736:7, 1739:4–1470:3, 1742:2–6; TenBrink Tr. 2035:11–19).

154. The Heavy Attack E–Frame prototypes PX 811 and PX 812 were created by Russ Edmisson (of Russ Edmisson Design) and Carl TenBrink (of Sonos Models) working closely together. (Edmisson Tr. 1173:9–12, 1775:21–1776:10).

155. The second Heavy Attack E–Frame—the one displayed at the 1993 Toy Fair (PX 812)—was modeled off of the first one (PX 811; Edmisson Tr. 1787:12–20).

156. The creators of the Heavy Attack E–Frame prototypes did not have access to BATTLETECH materials and were not familiar with BATTLETECH. (Edmisson Tr. 1737:10–1738:8, 1740:6–1741:25, 1746:2–5, 1753:2–7, 1760:2–25, 1776:21–24; TenBrink Tr. 2029:20–21, 2036:1–19, 1057:6–14).

157. To create the Heavy Attack E–Frame prototypes, Mr. Edmisson purchased six to eight third-party model kits, including the "RoboCop" ED 209 (DX 384) from a Japanese-imports store, and GI Joe action figures with spring-loaded weapons and military vehicles from Toys 'R Us, all of which were pieced together along with other materials to form the Heavy Attack E–Frame. (Edmisson Tr. 1743:8–1744:11).

158. Some of the pieces of the Heavy Attack E–Frame prototypes came directly from model kits: the legs came from the ED 209 kit, the upper portion was created from a plastic box, and a rotating cannon from a Hasbro GI Joe became part of one arm. (Edmisson Tr. 1746:8–14; TenBrink Tr. 2029:7–13, 2031:18–23, 2033:23–2034:5).

159. The nose cone of the Heavy Attack E–Frame was made from a Legg's pantyhose container. (Edmisson Tr. 1774:17–20; TenBrink Tr. 2032:10–18).

160. FASA has not shown by a preponderance of the evidence that any similarities between the Heavy Attack E–Frame prototypes and the Mad Cat design are not attributable to the many commonalities inhering in the pre-existing similar robots that are available to designers. (TenBrink Tr. 2037:24–2038:10).

161. The Mad Cat contains design elements of and is derived from the following specific prior BATTLETECH designs, which FASA now concedes are not original (per Pretrial Order, Exh. H): from Archer: arm joint assembly, construction and general axis of the mid-waist area, use of rotating hip joints, bipedal aspects of the legs; from Locust: placement of guns, placement of cockpit arrangement, hip joint assemblies and leg, feet; from Wasp: construction of hip joints, elements of the legs, foreleg and calf; from Stinger: legs; from Crusader: general construction of the torso, gun placements, shoulder connections—taking shoulder connections and using them as hip connections, legs; from Ostroc: hip joints resemble leg and arm joints; from Marauder: cockpit, arms, forearms, cockpit, weapon system, gun placement, feet; from Battlemaster: shoulder rocket launch system. (Macek Decl.; Macek Tr. 1111:14–1113:11).

162. Playmates established during the trial that the Heavy Attack E–Frame prototypes of its EXO–SQUAD toys were independently created.

**N.** *The Development Of EXO–SQUAD Toys Draws Inspiration From Third–Party Designs And Designs And Properties Other Than BATT-LETECH*

163. Mr. Aaronian was the liaison between Universal Cartoon Studios and Playmates' free-lance designers. He funneled input from Universal to the designers, commented on designs furnished by the designers, and made sure the designs fit with what Universal wanted and continued to adhere to the basic concept. (Aaronian Tr. 1896:18–1898:5).

164. All of the toy designs were reviewed by Universal to make sure they were in keeping with Universal's concept of the EXO–SQUAD program and were approved by Jeff Segal, Universal's President. (Segal Decl.).

165. Prior to this lawsuit, Mr. Segal had no knowledge of BATTLETECH designs, concepts, story-lines or characters. (Segal Decl.).

166. Mr. Semones, the art director for EXO–SQUAD, never heard of BATTLE-TECH until this action was filed. (Semones Dep., 31:11–16; 148:7–11).

167. Mr. Meugniot was the producer of EXO–SQUAD. He showed designs to Mr. Segal to obtain his approval or disapproval. He was not familiar with the contents of BATTLETECH and no one from Playmates ever mentioned BATTLETECH or discussed BATTLETECH at any Universal meetings at which he was present. (Meugniot Dep., 11:1–9, 73:17–22, 147:1–9).

168. Neither Mr. Edmisson nor Mr. Ten-Brink, who did some preliminary designs that did not lead to final toy designs, had any knowledge of BATTLETECH. (Edmisson Tr. 1737:10–1738:8, 1740:6–1741:25, 1746:2–5, 1753:2–7, 1760:2–25, 1776:21–24; TenBrink Tr. 2029:20–21, 2036:1–19, 2057:6–14).

169. Mr. Mosqueada, who did early drawings of designs for EXO–SQUAD toys, had no knowledge of BATTLETECH. (Mosqueada Dep., 41:15–42:3, 155:2–11, 158:4–7, 162:2–163:4, 163:21–164:4).

170. Mr. Geiman created the final designs associated with the EXO–SQUAD figures: Phaeton, J.T. Marsh, and Alec DeLeon, which designs were based on information furnished by Universal. Mr. Geiman was not aware of BATTLETECH, was not asked by Playmates to use or consult any BATTLE-TECH materials, and never discussed BATTLETECH with Playmates or anyone else involved in EXO–SQUAD. (Geiman Dep.).

171. In adapting and developing Universal's EXO–SQUAD concepts and designs for production as toys, the independent designers engaged by Playmates had knowledge of and familiarity with a wide variety of third-party designs and images, including: Japanese robot toys and designs predating 1985; the robotic exo-skeleton/power-loader from the movie *Aliens;* and, military books on armor, weapons, war machines, military vehicles, cockpits and bombers. (S. Lee Dep.; Mosqueda Dep.; Edmisson Tr. 1735–86; TenBrink Tr. 2035).

172. The EXO–SQUAD story line and characters were created by Universal Cartoon Studios, and the characters follow the story. (Sallis Tr. 1567:8–15). There is no evidence that Sallis ever discussed BATTLE-TECH with Segal or anyone else at Universal or ever furnished anyone at Universal with any BATTLETECH designs. (Segal Decl.).

173. The idea ultimately arrived at for the EXO–SQUAD story originated with Segal and stemmed from a futuristic story line modeled after World War II. The premise was that a charismatic leader (like Hitler) galvanized his people and, through treachery, started a war to take over the world. Forces (like the French Underground) resisted the occupation. Segal decided that "Neosapiens" would be a genetically-engineered race created by humans to perform certain tasks and who reproduced through cloning. Despite their superior abilities, the Neosapiens would be discriminated against by humans. A leader would arise who would galvanize the Neosapiens to rebel and, through treachery, would seek to take over the world. (Segal Decl.; Segal Tr. 1712).

174. In developing the theme, Segal postulated that Mars and Venus would become important sites for mining and farming in the future. Following this story line, humanity would need beings who could work and survive on Mars and Venus. Starting the story on Earth, Mars and Venus provided a reason for creating the Neosapiens, as well as a reason for utilizing space-vehicles and exploiting hardware concepts. The name "Neosapien" came from "neo" and "homo sapien" to suggest "new man." (Segal Decl.; Segal Tr. 1713).

175. To develop an opportunity for the Neosapiens to rebel, Segal's team created a fictional political situation, purportedly based in part on the history of Australia, in which criminals were to be exiled to various planets. The criminals became pirates who drew military forces away from the home worlds of Mars, Venus and Earth, leaving a power vacuum and giving the Neosapiens an opportunity to take control. Drawing on Segal's interest in Japan, he organized the pirates into groups along the line of Japanese samurai clans. In the samurai tradition, each clan has its own logos and banners, and Segal adopted those devices as part of the story. (Segal Decl.).

176. Segal also included hardware and robotic concepts in the new story line. Segal began with the idea that the humans and Neosapiens would use exo-skeletons or "E–Frames" to enhance their ability to work in space. The E–Frames became the foundation of the military vehicles used in the story and inspired the initial name "EXO–FORCE." Universal wanted a robotic concept that was different from the various robotic vehicles inspired by *Star Wars*. Universal's exo-skeleton concept was inspired in part by the powersuits found in the 1992 book, *The Forever War*, and by the power loader machine featured in the movie *Aliens*. In Universal's concept, the fundamental fighting unit was a man who would augment his physical powers and support various types of weapons through use of an exoskeleton or "E–Frame." (Segal Decl.).

177. Universal had been working with an interactive computer and virtual reality company called Pacific Data Images. This inspired Segal to think of ways to have a neural link between the E–Frame and the pilot. The solution Segal arrived at was a "cyberlink," or direct connection between the human and the machine. (Segal Decl.).

178. Universal hired outside designers to develop characters and vehicles based on the Neosapien and exo-skeleton concepts. Within a few weeks after Universal's April, 1992 meetings with Playmates, Universal had a preliminary story outline and a collection of sketches illustrating what the Neosapiens and the exo-skeletons might look like. (Segal Decl.).

179. Playmates' Sallis met with Universal on May 19, 1992, at which time Segal presented the newly-developed concept, which was initially called "EXO–FORCE" and which was eventually re-named "EXO–SQUAD." Sallis was very impressed by the story, characters and exo-skeleton concept. After the May 19, 1992 meeting, Universal proceeded with further development of the story bible and artwork. (Segal Decl.; Sallis Tr. 1594–99).

180. The EXO–SQUAD concept, story, characters and initial E–Frame design concepts were independently created by Universal.

181. None of FASA's BATTLETECH materials were used in Universal's development of the EXO–SQUAD concept, story, characters or basic E–Frame designs. None of FASA's BATTLETECH materials were used in the development of the EXO–SQUAD toy line. (Edmisson Tr. 1737–76; TenBrink Tr. 2029–36; Geiman Dep.; S. Lee Dep.; Mosqueda Dep.).

182. Playmates participated in the design of the EXO–SQUAD toy line by engaging freelance artists to adapt Universal's E–Frame concept for production as toys. (Aaronian Tr. 1850–57).

183. Universal Studios adapted existing robotic concepts to fit its story line, based on Japanese mecha animation, Japanese comic books, the various robotic vehicles inspired by *Star Wars*, the powersuits of the 1972 book *The Forever War* and the power loader machine in the 1986 movie *Aliens*. (Segal Decl.; Segal Tr. 1730–31).

184. Preliminary characters and vehicles were developed by Universal's designers without the involvement of Playmates. (Segal Decl.; Segal Tr. 1716–19).

185. During the development of the EXO–SQUAD toy designs, Mr. Segal, the President of Universal Cartoon studios, had no knowledge of any BATTLETECH concepts, story lines, designs or characters. To the best of his knowledge, the EXO–SQUAD concepts, story lines, designs and characters were not purposely derived from BATTLE-TECH. (Segal Decl.).

186. The design of robotic toys generally has been heavily influenced by the battling robots and robotic vehicles in the *Star Wars* films (starting 1976), by N.A.S.A. lunar exploration craft and by diverse robotic devices used in industry. (Moodie Decl.; Rovin Decl.).

187. Both BATTLETECH and EXO–SQUAD appear to draw from 1980s films that feature robots and mechanized vehicles, most notably the influential *Star Wars* and *Aliens* films, which this Court has specifically reviewed in the course of deciding this case. (Schaub Decl.; Sallis Tr. 1596:22–1597:9).

188. The EXO–SQUAD larger transport vehicles ("Light Attack E–Frames") have strong conceptual and design similarities to the Scout Walker vehicles that appear in the third *Star Wars* movie, *Return of the Jedi*: both are two-legged walking vehicles with a bird-like appearance that are similar in ways such as their gun actions, mechanical leg detail, and rotating "turret-type" upper body. (Schaub Decl.).

189. The robot-like "Power Loader" featured in the film *Aliens* (released in 1986) is similar to the EXO–SQUAD E–Frames in that it is a human-manned, hydraulic-assisted exo-skeleton, operated with a pistol-grip or joy stick that is used to enhance the capabilities of the soldier-pilot, including his strength, size, firepower, speed and armor. (Schaub Decl.).

190. In 1992, Kenner released a toy replica of the *Aliens* Power Loader, which has striking similarities to the EXO–SQUAD E–Frames: both have an external frame that mimics but enhances the motion of the soldier-pilot. (Schaub Decl.).

191. United States toy designers have access to an enormous amount of robot toys, model kits and depictions in books and magazines imported into the United States from Japan since the late 1970s. (Moodie Decl.; Rovin Decl.; Macek Decl.).

192. In the early 1980s, the Japanese robot toy lines from Bandai (GOBOTS marketed by Tonka in the U.S.) and Takara (Transformers marketed by Hasbro in the U.S.) both had an influence on all the other robot toys on the U.S. market. (Moodie Decl.).

193. Many additional Japanese toy lines have apparently influenced U.S. robotic toy lines, including the Voltron line marketed in the U.S. by Matchbox and the "Shogun" robot line marketed in the U.S. by Mattel in the late 1970s. (Moodie Decl.).

194. Starting in 1984, robotic toys manufactured in the United States have included exo-skeleton designs, including Centurions (by Kenner; used the term "Exo–Frame"), Spiral Zone (by Tonka), Inhumanoids (by Hasbro) and even G.I. Joe. Current toy designs are also influenced by the exo-skeleton in *Aliens*, the skeletal remains of the *Terminator* and the robot featured in movie *Robocop*. (Moodie Decl.).

195. Playmates' Sallis was personally familiar with several giant warrior robot lines before creating EXO–SQUAD: he worked on ROBOTECH in the mid–1980s, and viewed GUNDAM model kits while in Japan looking for a robot property, where he also considered GRIDMAN, VOTOMS and DOUGRAM. (Sallis Tr. 1576:12–25, 1577:7–14, 1579:5–7).

196. The design and details of EXO–SQUAD do not copy BATTLETECH's protectible interests but merely reflect the current state of the genre and consumers' expectations as to the visual language of the post-*Star Wars* marketplace. (Rovin Decl.; Rovin Tr. 2168:1–2180:2).

197. Mr. Lee, who created the final designs for the Maggie (which he called "repair bot"), Marsala (the scout), Shiva (the crab) and Livanus (troop transport) E–Frame toys, was unaware of any BATTLETECH designs while working on the EXO–SQUAD designs,

never saw the BATTLETECH game or any BATTLETECH publications, and never discussed BATTLETECH with anyone at Playmates or Universal. (Lee Dep., 66:1–4, 149:23–152:5, 153:2–11, 158:22–159:9).

### O. Specific, Non–Trivial Design Features Distinguish EXO–SQUAD From BATTLETECH

198. There are substantial, specific artistic differences between the parties' respective designs, which indicate that the EXO–SQUAD toys were not copied from the BATTLETECH designs. (Schaub Decl.; Rovin Decl.).

199. The EXO–SQUAD toy line has a different texture and feel than anything done before it. (Sallis Tr. 1533:5–8).

200. The relationship of the action figures to the Exo–Frame is a major fundamental characteristic of EXO–SQUAD that distinguishes the parties' designs, both in concept and in the physical way each limb of the toy pilot fits into a separate space in the E–Frame and can be seen once inside the E–Frame. In contrast, the BATTLETECH designs show no visible involvement of the soldiers who are presumed to be inside. (Schaub Decl.; Moodie Decl.; Schaub Tr. 2098:13–2099:20, 2107:19–2108.13).

201. Because EXO–SQUAD was designed to be a toy line, the emphasis is on the characters and their interaction. (Sallis Tr. 1533:15–22, 1563:6–12).

202. The use of exoskeleton robotic designs instead of traditional enclosed robots permits a greater focus on the pilot's personal character, because the child can see the whole character immediately upon looking at the toy. (Aaronian Tr. 1900–05).

203. In its development of the EXO–SQUAD toy line, Playmates placed great emphasis on matching each E–Frame with the character pilot associated with it. (Sallis Tr. 1563:23–1564:23).

204. Unlike the BATTLETECH MECHs other than the few "LAM's" (land and sea MECHs), all of the EXO–SQUAD E–Frames can fly. (Sallis Tr. 1606:14–1607:13).

205. BATTLETECH MECHs are supposed to be thirty meters tall. (Loose Tr. 42:1–2, 436:25). EXO–SQUAD E–Frames are supposed to be only eight to ten feet tall. (Siembieda Decl.).

206. EXO–SQUAD E–Frames leave the arms and hands of the pilot exposed, which is completely contradictory to the fundamental protective purpose of BATTLETECH's MECHs which are completely enclosed in a tank-like fashion. (Schaub Tr. 2101:10–15).

207. The overall look and appearance of EXO–SQUAD is very toy like: the coloration, styling and functions are all designed for enhanced play value. The BATTLETECH designs were originally intended to be game pieces. When designs are created not to be toys but as game pieces, they are likely to have a different overall look and appearance. (Moodie Decl.).

208. BATTLETECH designs differ from EXO–SQUAD's brightly-colored children's toys in that they "weren't meant to look like sleek, brand-new, pristine, beautiful objects. They're meant to look like dirty, beat-up, grungy, added-on pieces." (Loose Tr. 448:6–8).

209. The EXO–SQUAD Light Attack E–Frame toys differ from the BATTLETECH MECH designs in that the BATTLETECH designs do not imply a strong connection to the soldier inside them, whereas the E–Frames are all sized in relation to their pilots and prominently reveal and focus upon the character inside them in a way appropriate to children's play patterns. (Schaub Tr. 2113:10–24; Aaronian Tr. 1901–02; Moodie Decl.).

210. The Exoframes themselves can walk, hover, fly at very low altitudes like a helicopter, fly like an F–15 jet fighter, and fly in outerspace. They try to create the feeling that there are people inside. If launched from an aircraft carrier, EXO–SQUAD E–Frames would take off. If launched from an aircraft carrier, BATTLETECH MECHs would drop into the ocean. (Sallis Tr. 1605:15–1607:11).

211. The EXO–SQUAD toys do not replicate the "total concept and feel" of the protectible aspects of the BATTLETECH

MECHs. The EXO–SQUAD toys represent a different expression of the idea of robotic tank-like vehicles than the BATTLETECH MECHs. The EXO–SQUAD toys are not substantially similar to the protectible aspects of the BATTLETECH MECHs. Any general similarity between the EXO–SQUAD toys and the BATTLETECH MECHs is based on the mechanical and utilitarian features of the BATTLETECH MECHs.

212. The testimony of Schaub and Siembieda demonstrate the lack of substantial similarity between the EXO–SQUAD toys and the BATTLETECH protected designs. (Schaub Decl.; Schaub Tr. 2109:11, 2122:5; Siembieda Decl.).

213. Universal's Segal was not aware of BATTLETECH at any time during the development of the EXO–SQUAD concept. Playmates did not discuss BATTLETECH with Universal personnel, and Universal had no access to BATTLETECH materials. Playmates did not provide any of the independent designers of the EXO–SQUAD toys with any BATTLETECH materials, and did not instruct them to rely on or to consult any BATTLETECH materials.

214. Segal was, however, familiar with and aware of a long tradition of movies, animation, science fiction, science fact and history books that inspired ideas incorporated into EXO–SQUAD.

215. The EXO–SQUAD toy designs were independently created by outside designers without knowledge of BATTLETECH designs. (Edmisson Tr. 1737–67; TenBrink Tr. 1057, 2020–36; Geiman Dep.; Mosqueda Dep.; S. Lee Dep.).

216. Although the EXO–SQUAD toys have been widely sold and advertised since 1993, there are no probative instances of actual confusion between BATTLETECH and the EXO–SQUAD toy line.

217. None of the EXO–SQUAD E–Frames produced and sold by Playmates is identical to any original BATTLETECH design appearing in any of the copyrighted works relied upon by FASA.

## IV. CONCLUSIONS OF LAW—Phase Three

### A. *FASA Failed To Establish By A Preponderance Of The Evidence That Its Protectible Copyright Interests Were Copied By Playmates.*

1. This Court has already concluded in its Phase II Findings of Fact and Conclusions of Law that FASA has protectible interests, under copyright law, in the MAD CAT, KING CRAB, BLACKHAWK, DASHER, KOSHI, DAISHI and BUSHWACKER MECH designs. In order to prevail on its copyright infringement claims FASA must prove by a preponderance of the evidence that Playmates copied the protectible elements of its MECH designs. *Atari, Inc. v. North American Philips Consumer Elec. Corp.*, 672 F.2d 607, 615 (7th Cir.1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977).

2. It has been long settled that a plaintiff cannot succeed in his proof if (1) the similarities between the works are not sufficient to prove copying, or (2) it is established that one work was arrived at independently without copying. *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 (7th Cir.1994).

3. The Copyright Act does not require proof of identical copying, only "substantial similarity." *Wildlife Express Corp.*, 18 F.3d at 511. The test of substantial similarity is Judge Learned Hand's classic formulation of the ordinary observer test— "whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). However, "[p]arrotry does not always mean piracy." *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir.1994). Thus, FASA must show illegal copying. The focus in a copyright infringement action is therefore on the similarities in protectible expression. *Atari*, 672 F.2d at 618–19. "This requires a sharper focus: the Court must find

a substantial similarity between the *protectible* elements of the two works." *Id.* Thus, FASA must show that Playmates appropriated FASA's particular means of expressing an idea, not merely that Playmates expressed the same idea. The means of expression are the "artistic" aspects of a work; the "mechanical" or "utilitarian" features are not protectible. *Fisher–Price, Inc.,* 25 F.3d at 123.

4. To assess the impact of certain differences, one factor to consider is the nature of the protected material and the setting in which it appears. *Atari,* 672 F.2d at 619.

5. Copying may be established by proof of access and "substantial similarity." Whether Playmates copied constituent elements of FASA's designs that were original can be seen as involving two distinct issues. First, FASA must show that Playmates as a factual matter, physically copied its MECH designs from FASA. Second, FASA must further show that Playmates copied so much of the protectible elements of FASA's design that the copying was "illicit," i.e., it constituted "unlawful" or "improper" appropriation. *Fisher–Price,* 25 F.3d at 122–23.

6. The act of copying may be proven by either direct or circumstantial evidence. Direct evidence of copying, for example an admission by the defendant or testimony of an eyewitness to the copying, is exceedingly rare. *See* 3 NIMMER ON COPYRIGHT § 13.01 [B], at 13–10 to 13–12 (1994). Thus, copying is often proven through circumstantial evidence consisting of: (1) access by the defendant to the plaintiff's work and (2) "probative similarity" between the two works. *See Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir. 1992); Alan Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement,* 90 COLUM.L.REV. 1187, 1204–14 (1990); *see also Tienshan, Inc. v. C.C.A. Intern (N.J.), Inc.,* 895 F.Supp. 651, 657 n. 3 (S.D.N.Y.1995). As explained by Professor Latman the concept of "probative similarity" is used as indirect proof of copying by showing a defendant's opportunity to come into contact with plaintiff's work and general similarities be-

tween the works, which under all the circumstances, make independent creation unlikely. Such similarities may or may not be substantial. These general similarities are offered as probative of the act of copying. *See* Latman, *supra,* at 1214.

7. This Court concludes that FASA has presented evidence which raises a presumption that Playmates had access to FASA's protected works. Access can be found to exist when the defendant had an opportunity to view the protected item. *Wildlife Express,* 18 F.3d at 508 n. 5; *Sid & Marty Krofft Television Prods., Inc. v. McDonalds Corp.,* 562 F.2d 1157 at 1172 (9th Cir.1977); *Smith v. Little, Brown & Co.,* 245 F.Supp. 451, 458 (S.D.N.Y.1965). Furthermore, under the circumstances of this case, access can be established under the "corporate receipt doctrine." *See Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 942 (8th Cir.1992) (finding that physical propinquity between corporate employees can establish access from one corporate employee to another). Thus, if the Court finds "similarities" between the protectible aspects of the BATTLETECH MECHs and the EXO–SQUAD Toys exist that, in the normal course of events, would not be expected to arise independently in the two works and which therefore "are probative of Playmates having copied as a factual matter from [FASA's] work," then we can infer that Playmates physically copied FASA's designs. *See* 3 NIMMER ON COPYRIGHT § 13.01 [B], at 13–13. Furthermore, because access has been established, the level of "probative similarity" necessary to show physical copying is diminished. *See Aldon Accessories, Ltd. v. Spiegel, Inc.,* 738 F.2d 548, 553–54 (2d Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984).

8. In considering the issue of copying, this Court can consider: (1) testimony pertaining to the possibility of defendant's independent creation, including the dissimilarities between the works; (2) the existence of common features that are in the public domain; and (3) the prevalence of similar third-party works. *Selle v. Gibb,* 741 F.2d 896, 904–05 (7th Cir.1984); *qad. Inc. v. ALN Associates, Inc.,* 974 F.2d 834, 838 (7th Cir.

1992); *Scott v. WKJG, Inc.*, 376 F.2d 467, 469 (7th Cir.), *cert. denied*, 389 U.S. 832, 88 S.Ct. 101, 19 L.Ed.2d 91 (1967); *Sanford v. CBS, Inc.*, 594 F.Supp. 713, 717 (N.D.Ill.1984); *Atari, Inc. v. North Am. Philips Consumer Electronics Corp.*, 672 F.2d 607, 614, n. 6 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

■■■■ 9. In determining "probative similarity" the trier of fact may "dissect" the work to separate the similarities from the dissimilarities. *Wildlife Express, Inc.*, 18 F.3d at 506; *Scott v. WKJG, Inc.*, 376 F.2d 467, 469 (7th Cir.1967); *Stillman v. Leo Burnett Co.*, 720 F.Supp. 1353, 1358–59 (N.D.Ill. 1989). *See also Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir.1946). It is also acceptable to consider both the protectible and unprotectible elements together rather than considering only the protectible elements, as the Court must do when determining "substantial similarity." *See Fisher Price*, 25 F.3d at 123.

■■■■ 10. The concept of "substantial similarity" involves a focus on whether the ordinary lay observer would overlook the dissimilarities between the artistic (protectible) aspects of the two works and would conclude that one was copied from the other. *Fisher–Price, Inc.*, 25 F.3d at 123. Proof of both copying and unlawful appropriation are necessary to establish "substantial similarity" when that term is used as a term of art. *Stillman v. Leo Burnett Co., Inc.*, 720 F.Supp. 1353, 1359 (N.D.Ill.1989). A copy that does not unlawfully appropriate protectible expression cannot be substantially similar in the sense required to establish a violation. *Id.; See also Atari*, 672 F.2d at 614.

11. Determining whether two objects look similar is not a particularly demanding task; but divining whether protectible elements of two works are "substantially similar" has long been recognized as an inexact science. *Fisher–Price, Inc.*, 25 F.3d at 123. As the greatly esteemed Judge Learned Hand long ago recognized:

> Obviously, no principle can be stated as to when an imitator has gone beyond copying the "idea," and has borrowed its "expression." No one disputes that the copyright extends beyond a photographic reproduction of the design, but one cannot say how far an imitator must depart from an undeviating reproduction to escape infringement.

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960).

■■■ 12. The issue of whether Playmates has illegally copied FASA's protectible designs is made even more difficult than usual because the allegedly infringing items are in a different medium and are of a different nature than the copyrighted item. *See Ideal Toy Corp. v. Kenner Products, Etc.*, 443 F.Supp. 291, 301 (S.D.N.Y.1977). Here, the Court is essentially being asked to compare whether a number of three dimensional toys infringe the copyright protection of various two dimensional robotic-tank figure sketches.

13. An ordinary observer viewing the protectible aspects of FASA's BATTLE-TECH products and Playmates' EXO–SQUAD toys would not conclude that one was derived or copied from the other.

14. There are a number of significant differences between the EXO–SQUAD toys and the protected BATTLETECH designs as detailed in this opinion.

15. The specific expression of the conflict of each work is significantly different. The conflict in BATTLETECH involves a civil war between five houses or empires, the remnants of the once united STAR LEAGUE. Each house seeks to control the other. The situation is complicated by the return from the periphery of the exiled Star League Armed Forces to take control of the Inner sphere. The conflict in EXO–SQUAD, in contrast, is based on a rebellion by the Neosapiens, a race created as worker-slaves to serve humans. The Neosapiens rule harshly and are challenged by human resistance fighters called the EXO–SQUAD.

16. The EXO–SQUAD robotic toys differ from the robotic images found in *Star Wars*, ROBOTECH and BATTLETECH, which all involve fully-enclosed vehicles or body armor. In the BATTLETECH designs, the characters inside the vehicles are not visible. In contrast, the action figures in the EXO–SQUAD exo-skeletons are exposed, although

surrounded by a robotic frame or skeleton. This "exposed" exoskeleton is similar in concept to the "power loader" machine in the popular movie *Aliens*.

17. The renderings of the BATTLETECH vehicles are portrayed in a realistic and militaristic manner. The EXO–SQUAD toys, in contrast, are clearly portrayed in a cartoon-like manner—not as realistic military vehicles. .

18. The BATTLETECH vehicles are not specifically associated with any particular character. In contrast, the EXO–SQUAD toys strongly emphasize the character associated with the exoskeleton. Each "E–Frame" has a specific function associated with a particular character. For example, the E–Frame used by the character known as "Alec DeLeon", a communications specialist, is loaded with radar and surveillance equipment. The "evil" E–Frames used by the Neosapiens have an alien-like look, similar to insects.

19. The nature of the works is very different. The BATTLETECH works primarily involve esoteric gaming books that emphasize rules, weapon characteristics, and crude line drawings of various robotic vehicles. EXO–SQUAD involves three dimensional toys based on animation.

20. The overall tone of the BATTLETECH works is dark, ominous and sinister, and apparently directed to a teenage and adult audience. The overall tone of EXO–SQUAD, although involving a military situation, is light, colorful, and clearly directed to younger children.

21. The EXO–SQUAD toy line does not replicate the "total concept and feel" of the protectible original works of FASA's BATTLETECH products. *Wildlife Express*, 18 F.3d at 511; *Atari*, 672 F.2d at 620; *Roulo v. Russ Berrie & Co. Inc.*, 886 F.2d 931 at 939 (7th Cir.1989); *Krofft* 562 F.2d at 1164.

22. The EXO–SQUAD toy line does not exhibit probative or substantial similarity to the protectible original works of FASA's BATTLETECH products. *Roulo*, 886 F.2d at 940; *Williams Electronics, Inc. v. Bally Mfg. Corp.*, 568 F.Supp. 1274, 1276–1281 (N.D.Ill.1983) (granting summary judgment to defendant as to plaintiff's copyright claims after applying *Atari's* "substantial similarity" test and comparing only the protected elements of the "Hyperball" game to analyze elements in "Rapid Fire" game).

23. The relevant audience of FASA's BATTLETECH products is a very sophisticated group of game fans, who enjoy the mental stimulation of the BATTLETECH fantasy game world and who would not be inclined to overlook the substantial differences between FASA's BATTLETECH products and Playmates' EXO–SQUAD line.

24. An ordinary reasonable person would not find that the protectible original works of FASA's BATTLETECH products are substantially similar to the EXO–SQUAD toy line.

25. Although FASA's circumstantial access evidence is somewhat suspicious it does not establish by a preponderance of the evidence that actual copying occurred. *See Feder v. Videotrip Corp.*, 697 F.Supp. 1165, 1168, n. 3 (C.D.Colo.1988) (citing 3 NIMMER ON COPYRIGHT, § 13.01[B] at 13–7 (1988)).

26. Proof of access and substantial similarity raises only a presumption of copying which may be rebutted by the defendant with evidence of independent creation. *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 501 (7th Cir.1982); *Original Appalachian Artworks, Inc. v. Toy Loft*, 684 F.2d 821, 829 (11th Cir.1982). Playmates has produced sufficient evidence to rebut any presumption of copying raised by FASA by showing that the EXO–SQUAD toy line was a result of independent creation. *Atari, Inc.*, 672 F.2d 607, 614 n. 6; *Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1066 (4th Cir.1988); *Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976).

27. The Court specifically credits the testimony of Messrs. TenBrink, Edmisson and Asano, which details numerous, significant differences between FASA's Mad Cat design and Playmates' original two Heavy Attack E–Frame prototypes. More importantly, the uncontroverted testimony of Messrs. Edmisson and TenBrink established no prior knowledge of or copying of BATTLETECH

designs. (Edmisson Tr. 1737–76; TenBrink Tr. 2029–57).

28. As this Court previously noted in *FASA I,* there is a certain amount of similarity apparent between the BATTLETECH MECHs and the EXO–SQUAD toys, especially between the MAD CAT design and EXO–SQUAD HEAVY ATTACK E–FRAME design. Nevertheless, a general impression of similarity is not sufficient to make out a case of infringement. The only similarity of significance in assessing claims of infringement is similarity of expression. *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 912 (2nd Cir.1980). Any general similarities between the Mad Cat and Playmates' original two Heavy Attack E–Frames are based on general references to common source, prior works and mechanical or utilitarian features. These similarities are not based on artistic expression unique to the Mad Cat. *qad. Inc. v. ALN Assoc. Inc.,* 974 F.2d 834, 838 (7th Cir.1992); *Selle v. Gibb,* 741 F.2d 896, 904–05 (7th Cir.1984); *Sanford v. CBS, Inc.,* 594 F.Supp. 713, 717 (N.D.Ill. 1984).

29. In light of the many independently created and/or pre-existing third-party mecha designs, any similarity between EXO–SQUAD E–Frame designs and protected BATTLETECH designs cannot be attributed to copying by Playmates of FASA's protected designs, and are sufficiently explained and justified by the evidence concerning the development of the EXO–SQUAD toys. *See Ideal Toy Corp.,* 443 F.Supp. at 303.

30. Though certain general aspects of FASA's MECHs and EXO–SQUAD toy line are somewhat similar, nearly all of the similarities can be attributed to the fact that both designs are based on the same unprotectible general ideas, particularly a futuristic, interstellar, battle dominated environment; use of massive, robot-like war machines; use of computer and weapons systems that communicate directly with the pilot's brain; designation of robots into light and heavy categories; and use of break-away parts to simulate battle damage. *See generally FASA I,* 869 F.Supp. at 1351–53. The rendering of such general ideas is not in itself protectible; only

FASA's particularized expression of the ideas can be protected. *Mattel, Inc. v. Azrak–Hamway Intern, Inc.,* 724 F.2d 357, 360 (2d Cir.1983) (holding that action figure "warlords" toy dolls did not infringe "Masters of the Universe" toy dolls).

31. The total look and feel of EXO–SQUAD involves allowing a well developed toy action figure to have his own Exo–Frame to do battle with other bad characters.

32. The total look and feel of BATTLETECH involves allowing a game-player to believe he controls a tank-like robot that has a preexisting personality based on the vehicle's unique combination of weapons and gadgetry.

**B. *FASA Failed To Establish By A Preponderance Of The Evidence That There Is A Likelihood Of Confusion About The Source of EXO–SQUAD Toys***

33. FASA cannot prove infringement of its trademark without proving that the relevant customer base for its protected trade dress is likely to be confused about the source of Playmates' EXO–SQUAD toys and to think that they are FASA's. 15 U.S.C. § 1114(1)(b); *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 615 (7th Cir.1993). The Seventh Circuit recognizes that the Lanham Act applies to the likelihood of post-sale confusion of "prospective" or "potential" purchasers, not only point-of-sale purchasers. *Forum Corp. of Northern America v. Forum Ltd.,* 903 F.2d 434, 442 (7th Cir.1990); *International Kennel Club, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1081 (7th Cir.1988).

34. "A trademark is not a property right, but an identifier; so, provided no one is likely to be confused by the alleged infringer, there is no impairment of the interest that the trademark statute protects." *Libman Company v. Vining Industries, Inc.,* 69 F.3d 1360 (7th Cir.1995).

35. Use of a rival's mark that does not engender confusion about origin or quality is permissible. *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616, 618 (7th Cir.1995). "The use is not just permissible in the sense

that one firm is entitled to do everything within legal bounds to undermine a rival; it is beneficial to consumers. They learn at a glance what kind of product is for sale and how it differs from a known benchmark." *Id.*

36. Proof of actual confusion is not required in a trademark case unless, as is the case here, damages are sought. *Web Printing Controls Co. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1204–05 (7th Cir.1990). Because FASA is seeking both injunctive relief and damages in this case, the Court need only find a likelihood of confusion, not actual confusion, in its initial evaluation of FASA's trademark claims.

37. This circuit has established a seven-factor test that courts should use in determining whether likelihood of confusion exists between two products. This test involves a review of the following factors:

(1) Similarity between the marks in appearance and suggestion;

(2) Similarity of the products;

(3) Area and manner of concurrent use;

(4) Degree of care likely to be exercised by consumers;

(5) Strength of complainant's mark;

(6) Actual confusion; and

(7) Intent of defendant to 'palm-off his product as that of another.'

*Smith Fiberglass Prods. v. Ameron*, 7 F.3d 1327, 1329 (7th Cir.1993); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 615 (7th Cir.1993); *International Kennel Club, Inc. v. Mighty Star*, 846 F.2d 1079, 1087 (7th Cir.1988).

38. In evaluating these seven factors, the Court has carefully looked at the totality of the circumstances and evidence. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1184 (7th Cir.1989). "Whether or not there is a likelihood of confusion is a question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties." *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167 (7th Cir.1986).

39. The packaging for the EXO–SQUAD toys is clearly labeled with the distinctive and well-known "EXO–SQUAD" mark, Universal logo and Playmates logo.

40. Prior to initiating this suit, FASA primarily advertised and sold BATTLETECH products, within the niche market of adventure game players, most of whom are adolescents or adults.

41. Playmates' EXO–SQUAD toys are sold primarily through major mass merchandisers of toys, and EXO–SQUAD advertising is directed toward children from four to eleven years of age. The EXO–SQUAD children's animated television show aired weekly during its first season and aired five days a week during its second season. This show did not seek to confuse BATTLETECH with EXO–SQUAD and instead primarily sought to develop the play characters sold with the EXO–SQUAD toys.

42. The fact that the products at issue may be "very different" is not dispositive of the issue of the similarity of the products in determining the existence of a likelihood of confusion between products. Courts have protected trademark owners against the use of confusingly similar marks on closely related products to protect the owner's ability to enter product markets in which it does not trade but into which it might reasonably be expected to expand in the future. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir.1992), *on remand*, 34 F.3d 1340 (7th Cir.1994). The issue is whether the products are the kind the public attributes to a single source. *McGraw–Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1169 (7th Cir.1986).

43. In this case, the Court finds that the labeling of the products and the packaging and promotional techniques are an important factor in determining whether the consumer is likely to be confused as to the source of the EXO–SQUAD product. *See Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F.Supp. 870, 884 (N.D.Ill.1992).

44. In its Phase II findings, this Court found that the BATTLETECH protected designs were not inherently distinctive but did have some secondary meaning which was

described as "weak." The Seventh Circuit has recognized that the same considerations supporting a factual finding of secondary meaning may mitigate against determining as a factual matter that the labels of a product alone prohibit confusion because some of the facts supporting a finding of stray secondary meaning are the same as facts used in other cases to find consumer confusion even with unique labeling. Nonetheless, these facts must be considered repeatedly in the factual context of consumer confusion rather than being swept aside as a matter of law based on a finding of secondary meaning. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1187 (7th Cir.1989).

45. The relevant consumer group in this case includes purchasers and potential purchasers of FASA's BATTLETECH products. *See, Nike, Inc. v. "Just Did It" Enters,* 6 F.3d 1225, 1229–1233 (7th Cir.1993). The Court finds that the relevant consumer market for BATTLETECH MECH products is a very sophisticated group of game fans who enjoy the mental stimulation of the BATTLETECH fantasy game world. Because the custom equipment of each BATTLETECH MECH is a highly significant factor in the combat aspects of the game, the Court finds that this relevant consumer group would not be disposed to overlook many of the differences in detail between the protectible aspects of the BATTLETECH MECHs and the EXO–SQUAD toys, especially when considering the prominent Playmates logo displayed on all EXO–SQUAD toys.

46. There is no probative evidence that consumers of action toys and action toy figures are likely to confuse the trade dress of EXO–SQUAD with BATTLETECH. Although the EXO–SQUAD toys have been widely sold and advertised since 1993, there are no probative instances of actual or likely confusion between BATTLETECH and the EXO–SQUAD toy line.

47. There is no evidence that Playmates intended to confuse the relevant consumer group into believing that EXO–SQUAD toys are in fact related to BATTLETECH. To the contrary, all of EXO–SQUAD's packaging and advertising clearly and repeatedly indicates that it is EXO–SQUAD material.

48. FASA has not produced any probative evidence of actual consumer confusion or a likelihood of consumer confusion. FASA's three purported confusion witnesses offered weak and unsubstantiated evidence on the issue of likelihood of confusion. Such de minimis evidence of confusion may be discounted by the Court. *See Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 383 (7th Cir.1976). Moreover, their collective testimony was biased by their unique allegiance to the BATTLETECH Universe. *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 396 (7th Cir.1992).

49. Playmates has produced probative evidence showing that consumers of toy products are not likely to be confused between BATTLETECH and EXO–SQUAD toys.

50. The Court finds that there is no likelihood of confusion that the relevant consumers seeking BATTLETECH MECH products will mistake EXO–SQUAD toys for BATTLETECH MECHs.

### C. *Playmates' Inclusion Of A Picture Of Its Planned Heavy Attack E–Frame In Its 1993 Toy Catalog Did Not Constitute Unfair Competition*

1. FASA's last attempt at establishing liability by Playmates involves an unfair competition claim under the trademark laws based on Playmates' failure to produce the Heavy Attack E–Frame it exhibited at the 1993 Toy Fair. Section 43(a)(2) of the Lanham Act prohibits the use of false or misleading statements or representations of fact in commercial advertising. 15 U.S.C. § 1125(a)(2). This provision creates private remedies for (1) statements which are literally false and (2) statements which, while literally true or ambiguous, convey a false impression or are misleading in context, as demonstrated by actual consumer confusion. *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 13 (7th Cir.1992). This claim also fails because FASA has failed to meet its burden of proof.

2. FASA's evidence did not establish any false or misleading advertising by Playmates which led to consumer confusion. There is little evidence that Playmates did

not intend to produce or distribute the Heavy Attack E–Frame *at the time* its picture was placed in its 1993 toy catalog. (Sallis Tr. 1571–72; Aaronian Tr. 1876). At best, Sallis indicated that his experience led him to believe when he first saw the prototype before the 1993 Toy Fair that he would drop the Heavy Attack E–Frame from the EXO–SQUAD toy line. (Sallis Tr. 1545).

3. It is well known in the toy industry that all toys exhibited at Toy Fairs, which are targeted toward the retail trade, are not automatically manufactured. (Fukutaki Tr. 1372; Welch Tr. 2066). FASA did not establish that Playmates distributed catalogs and literature after the 1993 Toy Fair which solicited orders for the Heavy Attack E–Frame. There is also no evidence that FASA lost any customers to Playmates as a result of this advertising. *See Grove Fresh Distributors, Inc. v. New England Apple Prods. Co.,* 969 F.2d 552, 557 (7th Cir.1992).

■ 4. It was not established that the Toy Fair and Playmates catalog were accessible to the general public. Advertising material that is not distributed to the general public cannot support a claim of false advertising. *Marcyan v. Nissen Corp.,* 578 F.Supp. 485, 507 (N.D.Ind.1982), *aff'd,* 725 F.2d 687 (7th Cir.1983).

5. There is no evidence that a "substantial portion" of target consumers ever were deceived by Playmates' 1993 catalog. Playmates only received orders from eighteen customers for the Heavy Attack E–Frame (PX 794). The trial evidence established that Playmates advised all of its major customers during the 1993 Toy Fair that the Heavy Attack E–Frame had been dropped from the current line. (Sallis Tr. 1690–91; Welch Tr. 2060–67). Playmates' sales representatives were also instructed to inform the remaining, smaller customers of Playmates' decision. (Welch Tr. 2069–70). Customers were told that Playmates might produce the Heavy Attack E–Frame in the future. (Welch Tr. 2073).

6. FASA has not shown any direct injury that is a result of Playmates' presentation of the Heavy Attack E–Frame at the 1993 Toy Fair or in its 1993 toy catalog. *Schutt Mfg. Co. v. Riddell, Inc.,* 673 F.2d 202 (7th Cir. 1982). Tyco's decision not to proceed with its BATTLETECH toy line immediately after the 1993 Toy Fair was based on a multitude of business factors which included the release of a competitive product.

### CONCLUSION

The bottom line in this case is that Playmates made a conscious business decision that it could proceed with the development of its EXO–SQUAD toy line after it had been given access to the BATTLETECH designs without the necessity or cost of obtaining a license from FASA. After extensive and undoubtedly costly litigation this business decision has been found by this Court not to violate FASA's legal rights. Nevertheless, this Court believes that the facts of this case do not warrant the imposition of any costs upon FASA for seeking to vindicate its legally protectible rights. This case is dismissed with prejudice with both sides to bear their own costs.

APPENDIX A

PLAINTIFF'S EXHIBIT PX 799E

# EXO-SQUAD

**Name: Amphibious
Assault Light Attack E-Frame**

"SHIVA"

# BATTLETECH

**Name: King Crab**
PRODUCT: TECHNICAL READOUT: 2750
BLACK & WHITE COMPARISON

PLAINTIFF'S
EXHIBIT
PX 799F

**EXO-SQUAD**

**Name: Heavy Attack E-Frame**

**BATTLETECH**®

**Name: Mad Cat**

PRODUCT: BATTLETECH CENTER FLYER

BLACK & WHITE COMPARISON

FLIPPED HORIZONTALLY FOR COMPARISON

APPENDIX C

# EXO-SQUAD

**Name: Rapid Assault Light Attack E-Frame**

"MARSALA"

PLAINTIFF'S EXHIBIT
PX 799B

# *BATTLETECH*®

**Name: Blackhawk**

PRODUCT: TECHNICAL READOUT: 3050

BLACK & WHITE COMPARISON

# APPENDIX D

"DAISHI"

PGX 7B

**Alternate Configuration A**

| Item | Loc | Crit | Tons |
|---|---|---|---|
| Double Heat sink (1) | CT | 2 | 1 |
| Gauss Rifle | LA | 6 | 12 |
| Ammo (Gauss) 24 | LA | 3 | 3 |
| CASE | LA | 0 | 0 |
| Streak SRM 6 | LT | 2 | 3 |
| Streak SRM 6 | LT | 2 | 3 |
| Ammo (Streak) 30 | LT | 2 | 2 |
| Double Heat Sink (1) | LT | 2 | 1 |
| CASE | LT | 0 | 0 |
| Large Pulse Laser | RA | 2 | 6 |
| Large Pulse Laser | RA | 2 | 6 |
| Large Pulse Laser | RA | 2 | 6 |
| Double Heat Sink (1) | RA | 2 | 1 |
| Anti-Missile System | RT | 1 | 0.5 |
| Ammo (Anti-Missile) 72 | RT | 3 | 3 |
| Double Heat Sink (2) | RT | 4 | 2 |
| CASE | RT | 0 | 0 |
| Double Heat Sink (1) | RL | 2 | 1 |

**Alternate Configuration B**

| Item | Loc | Crit | Tons |
|---|---|---|---|
| ER Small Laser | CT | 1 | 0.5 |
| ER PPC | LA | 2 | 6 |
| ER PPC | LA | 2 | 6 |
| Medium Pulse Laser | LA | 1 | 2 |
| Medium Pulse Laser | LA | 1 | 2 |
| Ultra-2 AC | LT | 2 | 5 |
| Ultra-2 AC | LT | 2 | 5 |
| Ultra-2 AC | LT | 2 | 5 |
| Ammo (AC) 90 | LT | 2 | 5 |
| CASE | LT | 0 | 2 |
| LB 10-X | RA | 5 | 0 |
| Ammo (AC) 20 | RA | 2 | 10 |
| CASE | RA | 0 | 2 |

APPENDIX E

# EXO-SQUAD

**Name: Field Repair**
**Light Attack E-Frame**

"MAGGIE"

# BATTLETECH®

**Name: Dasher**

PRODUCT: TECHNICAL READOUT: 3050

BLACK & WHITE COMPARISON

PLAINTIFF'S EXHIBIT

PX 799A

APPENDIX F

"KOSHI" PGX 7B

**Alternate Configuration A**

| Equipment | Location | Qty | Tons |
|---|---|---|---|
| Beagle Active Probe | H | 1 | 1 |
| TAG | LA | 1 | 1 |
| Anti-Missile System | LA | 1 | 0.5 |
| Anti-Missile System | LA | 1 | 0.5 |
| Ammo (Anti-Missile) 72 | LA | 3 | 3 |
| CASE | LL | 0 | 0 |
| A-Pod | RA | 1 | 0.5 |
| Flamer | RA | 1 | 0.5 |
| Machine Gun | RA | 1 | 0.25 |
| Ammo (MG) 200 | RA | 1 | 1 |
| CASE | RA | 0 | 0 |
| A-Pod | RL | 1 | 0.5 |

**Alternate Configuration B**

| Equipment | Location | Qty | Tons |
|---|---|---|---|
| Beagle Active Probe | H | 1 | 1 |
| ER Medium Laser | LA | 1 | 1 |
| ER Medium Laser | LA | 1 | 1 |
| SRM 6 | RA | 1 | 1.5 |
| SRM 6 | RA | 1 | 1.5 |
| Ammo (SRM) 30 | RA | 2 | 2 |
| CASE | RA | 0 | 0 |
| ER Small Laser | RA | 1 | 0.5 |

**Alternate Configuration C**

| Equipment | Location | Qty | Tons |
|---|---|---|---|
| Beagle Active Probe | H | 1 | 1 |
| Guardian ECM | LA | 1 | 1 |
| Anti-Missile System | LA | 1 | 0.5 |
| Ammo (Anti-Missile) 24 | LA | 1 | 1 |
| CASE | LA | 0 | 0 |
| ER Large Laser | RA | 1 | 4 |
| ER Medium Laser | RA | 1 | 1 |

**Alternate Configuration D**

| Equipment | Location | Qty | Tons |
|---|---|---|---|
| Beagle Active Probe | H | 1 | 1 |
| Ultra-2 AC | LA | 2 | 5 |
| Ammo (AC) 45 | LA | 1 | 1 |
| CASE | LA | 0 | 0 |
| ER Medium Laser | RA | 1 | 1 |
| ER Small Laser | RA | 1 | 0.5 |

## APPENDIX G

PLAINTIFF'S
EXHIBIT

PX 799C

# EXO-SQUAD

## Name: Command E-Frame

"PHAETON"

# BATTLETECH®

## Name: Elemental

PRODUCT: WOLF CLAN SOURCEBOOK
BLACK & WHITE COMPARISON

APPENDIX H

DEFENDANT'S
EXHIBIT

805

GROUP